# EXHIBIT B
# TO
# LAVERNE DECLARATION

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

BARRY HONIG,

              Plaintiff,

         v.                          16 CV 7477 (PGG)

TERI BUHL,

              Defendant.
------------------------------x
                                     New York, N.Y.
                                     February 1, 2017
                                     11:45 a.m.
Before:

                 HON. PAUL G. GARDEPHE,

                                     District Judge

                      APPEARANCES

HARDER MIRELL & ABRAMS, LLP
     Attorneys for Plaintiff
BY:  CHARLES J. HARDER
          -and-
DEALY SILBERSTEIN & BRAVERMAN, LLP
     Attorneys for Plaintiff
BY:  AMANDA E. MAGUIRE

HOLLAND & KNIGHT
     Attorneys for Defendant
BY:  CHRISTINE WALZ
     SEAN C. SHEELY
```

|   |   |
|---|---|
| 1 | THE DEPUTY CLERK:  Call the case of Honig v. Buhl, et |
| 2 | al.  Is the plaintiff ready? |
| 3 | MR. HARDER:  Yes, your Honor.  Charles Harder for the |
| 4 | plaintiff Barry Honig. |
| 5 | MS. MAGUIRE:  Amanda McGuire, we are local counsel for |
| 6 | plaintiff Barry Honig. |
| 7 | MS. WALZ:  Christine Walz here on behalf of Teri Buhl. |
| 8 | MR. SHEELY:  Sean Sheely, Holland & Knight for Teri |
| 9 | Buhl. |
| 10 | THE COURT:  Here is a case where the plaintiff, who is |
| 11 | a private investor, is alleging he was libeled by Teri Buhl who |
| 12 | I understand to be an investigative journalist.  And the false |
| 13 | statements, the alleged false statements were made in an |
| 14 | article dated May 26, 2016, in which Ms. Buhl made certain |
| 15 | statements about Mr. Honig and the possibility of an SEC |
| 16 | subpoena having been served on an entity that he is allegedly |
| 17 | associated with, and there is a number of statements related to |
| 18 | that. |
| 19 | So, I will tell you that my impressions from what I've |
| 20 | read so far are that the case should be settled.  And so, the |
| 21 | question is why.  Why are we here, why is it that the parties |
| 22 | have not been able to work out some type of agreement. |
| 23 | So, Mr. Harder, from your perspective, why hasn't the |
| 24 | matter settled? |
| 25 | MR. HARDER:  Your Honor, there have been some initial |

settlement discussions, and I think that we just need to have a few additional settlement discussions. And I'm here in New York, and I was planning to speak to defense counsel about that after this court appearance. We're working on it.

THE COURT: Who wants to speak on behalf of the defendant?

MS. WALZ: Your Honor, I'd like to speak on behalf of Ms. Buhl. Defendant is confident in the journalism here, and is not currently willing to -- we're certainly willing to discuss settlement, but is not willing to retract any of the statements that have been made, and I think that may prove to be a barrier to settlement here.

THE COURT: Let me give you my impression. My impression is this litigation is likely to be complex, lengthy, and expensive. And so that's why I question whether it's rational to spend the next two or three years litigating this case. I really question whether it's rational.

Now, there is a proposal by the defendant to file a motion to dismiss, and I will say that as to certain of the portions of the article that are the basis for the libel suit, it's not entirely clear to me how some of these statements are actionable.

Let me ask an initial question before I get into the specific statements. And that is, is the defendant going to be taking the position that the plaintiff is a limited purpose

public figure?

MS. WALZ:  Yes.

THE COURT:  I assume that in taking that position, you believe you have evidence that he's injected himself in some fashion into the public vortex such that he would qualify as a limited purpose public figure?

MS. WALZ:  Yes, your Honor, within this sphere of small cap finance, we believe he is a limited purpose public figure.

THE COURT:  All right.  Is plaintiff going to dispute that?

MR. HARDER:  Yes, your Honor.  We believe the plaintiff is a private figure.

THE COURT:  Okay.  Well, that's another significant legal issue.

With respect to the particular statements, one of the cited statements that's alleged to be defamatory is, and I quote "Plaintiff teemed up with his favorite investor, investing partner Michael Brauser."

Mr. Harder, what is your theory on how that is defamatory?

MR. HARDER:  That's a good question, your Honor.  We believe the evidence may show that Mr. Brauser has a negative public impression, and that by associating my client with somebody like that, that it is defamatory of my client because

it's false. And it would cause people within the investment community to avoid, shun, stay away from my client and cost him economic opportunities.

THE COURT: Well, that frankly sounds like speculation now. There is going to be a motion to dismiss filed. You're going to having to demonstrate there are facts pled in the complaint from which I could find that there is a defamatory aspect to being associated with Michael Brauser.

So, there is another statement, and I quote, "Market participants sit on the sideline to see if the SEC can get the goods to finally charge Barry Honig."

What is your theory on how that's defamatory?

MR. HARDER: Your Honor, if market participants are sitting on the sideline, that means they are not making investments, and that means that the stock price is being depressed, and that's costing Mr. Honig money. If other people read this and decide that they're going to sit on the sidelines as well, based upon this theory that is false, it is a false predicate from the outset, that the SEC has anything -- any investigation taking place with Mr. Honig, which it doesn't. So --

THE COURT: So when you say "market participants," could you tell me who the market participants are? Are these potential investors in something that your client is involved? I don't understand the reference to market participants. See,

1  I read "market participants" to be simply market participants.
2  But I gather what you are saying is they're potential investors
3  in one of Mr. Honig's businesses.
4         Is that your theory?
5         MR. HARDER:  Well, your Honor, Mr. Honig is an
6  investor himself.  So he invests in companies.
7         THE COURT:  That's one reason why I don't understand
8  the defamatory import.  Because I thought your position is he
9  is a passive investor, he's actually not operating a business
10 himself.  So I don't understand who the market participants are
11 who are sitting on the sidelines.
12        I understand this isn't your article, but it is your
13 theory that this is defamatory.  And I'm asking how is it
14 defamatory?
15        MR. HARDER:  Yes, your Honor.  Mr. Honig is a passive
16 investor in stocks.
17        THE COURT:  Right.
18        MR. HARDER:  One of these stocks is MGT, and he has
19 others as well.  If there is a false impression in the
20 marketplace that the SEC is gunning for Barry Honig, and that
21 market participants, people potentially also investing in
22 companies, are avoiding Barry Honig companies that he's
23 invested in, that causes a depression of his investments.  It's
24 not just his investments, it's other people's as well.
25        But as to the defamation it's causing -- this is

1  something that causes the marketplace to shun Mr. Honig, to
2  avoid him, to not get involved with him, and to not get
3  involved with companies that he's involved with.
4        THE COURT: I can certainly understand that if these
5  were Mr. Honig's companies, but the way you've presented it is
6  he's just an investor. He doesn't operate a company. He makes
7  investments as he deems appropriate. Is the idea that he
8  controls some of these companies?
9        MR. HARDER: Well, Ms. Buhl is saying that he does.
10 He does not. Which is another -- but I believe that this
11 sentence is tied in to some of those other sentences as well.
12       Your Honor, if I may. If the public that invests
13 believes that Mr. Honig is controlling these companies and that
14 the SEC is investigating him and trying to put him in jail or
15 punish him in some fashion, that depresses the market for that
16 stock.
17       THE COURT: Well, let me ask you. Let's get to the
18 bottom of it. Is there an SEC subpoena that was served on some
19 company that Mr. Honig had an interest in?
20       MR. HARDER: There is an SEC subpoena. We don't have
21 a copy of it. We have discovery out to the defense to provide
22 it to us. We do have information --
23       THE COURT: I'm not sure they have it, actually. But
24 I'll get to that in a moment.
25       MR. HARDER: Okay. We do have information, your

1     Honor, that almost every single question has absolutely nothing
2     to do with Barry Honig.  However --
3              THE COURT:  When you say "question," what are you
4     talking about?
5              MR. HARDER:  Requests for production of documents.
6              THE COURT:  That's not a question.  Subpoenas,
7     generally speaking, they either seek testimony from somebody or
8     they seek documents.  They don't contain questions.  They say
9     give me all your documents that concern MGT.  And the recipient
10    is obligated to do that.
11             So that's another thing I don't understand here, is --
12    there are references to what kinds of questions Mr. Honig has
13    been asked.  I don't know what that has to do with because it's
14    in the context of a subpoena, what I understand to be a
15    subpoena for documents.
16             But are you telling me you don't have the subpoena and
17    you don't know what it says?  You don't know what it sought?
18             MR. HARDER:  We don't have the subpoena.  We have
19    spoken to people who have seen the subpoena, and have told us
20    that these statements are completely false, as they have
21    observed the subpoena.
22             THE COURT:  There's another statement, "Barry Honig is
23    pulling out the big legal guns, apparently worried about what's
24    inside that SEC subpoena."  Isn't that opinion?
25             MR. HARDER:  Well, it's a factual statement that he's

1    worried about the subpoena --
2             THE COURT:  What about "apparently worried."  Doesn't
3    that suggest to you that may not be a statement of fact?  When
4    somebody says "apparently," doesn't that sound like almost
5    speculation at that point?
6             MR. HARDER:  Well, your Honor, it sounds like a
7    factual statement that the writer doesn't know if it's true or
8    not.  Which I think if my client is required to prove actual
9    malice, which I don't believe he is, then we would drill down
10   on what is it that give Teri Buhl the appearance that he's
11   worried about the SEC, because he's not worried about the SEC.
12   Did Ms. Buhl have a factual predicate to even make a statement
13   like that?
14            THE COURT:  All right.  Let me speak with Ms. Walz for
15   just a second.  So do you have the subpoena?
16            MS. WALZ:  I do have the subpoena.
17            THE COURT:  Great.  So you can tell us what it
18   actually is about.  So who is the subpoena directed to?
19            MS. WALZ:  The subpoena is directed to MGT Capital.
20            THE COURT:  Okay.
21            MS. WALZ:  Which is the company that Barry Honig has
22   invested in.  It is a subpoena for documents.  It's our
23   position that the Court can take judicial notice of the
24   subpoena when it is attached to the motion to dismiss or that
25   the Court can look at it, because the subpoena is referenced in

the complaint. And so we're not hiding ball. We will make the subpoena available. It seeks documents pertaining to Mr. Honig and a number of individuals that he routinely invests in and companies that he has invested in.

THE COURT: Now, there are a number of statements that have been challenged by the plaintiff that relate to the subpoena. There's one, it says "90 percent of the regulators' questions are about Honig."

What's that about? Can you give me any insight into what that's about?

MS. WALZ: That was a sourced quote that was later --

THE COURT: Somebody told your client that?

MS. WALZ: Yes. And it was later altered in Ms. Buhl's reporting to say that "a large portion of the regulators' questions." So I think non-lawyers referring to a subpoena for documents are looking at it and saying, well, this is about Mr. Honig, not recognizing that they're not questions, they're requests for documents.

THE COURT: Now she also apparently repeatedly refers to Mr. Honig as the target of an SEC subpoena or an SEC investigation. Right?

MS. WALZ: She does, and although that was again later changed to "subject." But "subject" or "target," that gist or sting means the same I think.

THE COURT: What was the goal, if you can tell me, in

changing the language from "target" to "subject"?

MS. WALZ: I think when Mr. Honig contacted her or Mr. Honig's lawyers contacted her, there was particular concern with the term "target." She said, well, subject.

THE COURT: What's interesting to me is that for purposes of the Department of Justice, those are terms of art. And they have very defined meanings. That may not be true for the SEC. I suspect it's not.

But calling somebody a target for purposes of the U.S. attorney's office investigation has a very specific meaning. Calling somebody a subject has a different meaning. I don't know whether your client, whether that had anything to do with what was going on here.

MS. WALZ: I think when that issue was raised she said "subject" is most accurate. Because, again, "target" may have -- may be a term of art.

THE COURT: I'm telling you it is a term of art for purposes of the Department of Justice. It may not be a term of art at the SEC. It is definitely a term of art at the Justice Department, and what it means, generally speaking, is that the prosecutor has sufficient information at that time to charge the person. That's what target means. And then subject means that your activities are within the scope of the U.S. attorney and grand jury's investigation.

So, those terms have specific meaning in the context

1  of an investigation being conducted by the U.S. attorney's
2  office. As I said, I'm not that familiar with the SEC, and it
3  may be that these terms are not used by the SEC. But they have
4  a very specific meaning with the Justice Department.
5         MS. WALZ: But, your Honor, if I may, I think that
6  here the gist or sting of "subject" or "target," given the
7  audience of this blog, is going to be the same.
8         THE COURT: I guess if that's true, it raises the
9  obvious question why your client decided to change it, if it
10 has no meaning. So it kind of undercuts -- you just told me it
11 said "target," and there was a complaint by the lawyer and it
12 was changed to "subject." So that would suggest that your
13 client, at least, thought there was a difference between
14 "target" and "subject" or she wouldn't have changed it.
15        MS. WALZ: I think she wanted to be accurate in her
16 reporting. But I think for purposes of the legal analysis
17 related to it, that's a different assessment than her
18 journalism.
19        THE COURT: There is also a statement, and I quote
20 "Barry uses other people to run a company he is secretly
21 controlling and pays stock pumpers to tout the company without
22 disclosure."
23        That sounds like a statement of fact. Do you
24 disagree?
25        MS. WALZ: No, I think there are portions of that that

1  are disclosed facts, and then it's her characterization based
2  on those disclosed facts.
3      THE COURT:  Specifically, when she says "He pays stock
4  pumpers to tout the company without disclosure," that is
5  susceptible to being proven true or false, right?
6      MS. WALZ:  Absolutely.
7      THE COURT:  Also, there is a statement that Mr. Honig
8  is involved in "tons of questionable pump-and-dump deals."
9      Accepting that "tons" is slang or a hyperbole or
10 whatever, whether or not Mr. Honig is involved in lots of
11 questionable pump-and-dump deals, presumably that would be
12 subject to being proven true or false.
13     MS. WALZ:  Yes, I agree.  The tons portion is what is
14 the opinion.  The disclosed facts there are going to be in the
15 fact that he is involved in questionable pump-and-dump deals
16 are based on judicial records that are covered by the fair
17 report privilege.
18     THE COURT:  When you say judicial records, are these
19 complaints that have been filed in cases against Mr. Honig?
20     MS. WALZ:  Yes.
21     THE COURT:  What's the nature of the court records?
22     MS. WALZ:  So there are complaints that allege this,
23 and there is a plea agreement in a case that also alleges it.
24     THE COURT:  Did that involve Mr. Honig?
25     MS. WALZ:  Yes.  I mean -- can you repeat your

1    question?

2           THE COURT:  Yes.  You said there was a plea agreement
3    and my question was did that involve Mr. Honig.

4           MS. WALZ:  Did the --

5           THE COURT:  Plea agreement involve Mr. Honig.

6           MS. WALZ:  The plea agreement did not, but it involved
7    someone who was involved with Mr. Honig who took a plea deal,
8    and in his plea agreement referred to Mr. Honig and his
9    activities with Mr. Honig.

10          THE COURT:  Let me say that today's conference just
11   confirms my view that this case is replete with legal and
12   factual issues that will occupy all of us for several years.
13   And I really question whether that's a good use of everyone's
14   time.

15          The issue, the primary issue that brings us here today
16   is the request to file a motion to dismiss.  I would urge the
17   parties to talk between themselves about some of these
18   statements and make sure that there is both a good-faith basis
19   for alleging that they constitute defamation, and also, to the
20   extent that the defendant wants to move against them, there is
21   a good-faith basis for doing so.

22          With that understanding, Ms. Walz, how long do you
23   want to prepare your motion to dismiss?

24          MS. WALZ:  Could we have until next Friday, your
25   Honor?

THE COURT: Sure. So next Friday is February 10. And how long do you want to put in your opposition, Mr. Harder?

MR. HARDER: Two weeks, your Honor.

THE COURT: Okay. So that would bring us to February 24. And a week to reply Ms. Walz.

MS. WALZ: Yes.

THE COURT: So that would bring us to March 3.

There has been an application to stay discovery while the motion to dismiss is pending. And I do have a question mark in my mind as to whether a number of the statements at issue will survive a motion to dismiss. So my inclination is to stay discovery until the motion to dismiss is resolved, because it would be wasteful to have discovery proceed as to statements that I've later determined are not actionable.

But, before doing that, Mr. Harder or Ms. Walz, I'm happy to hear people's views on whether discovery should be stayed.

MR. HARDER: Thank you, your Honor. We would ask that discovery not be stayed. There are statements that the Court has discussed today that are statements of fact which we believe are defamatory, particularly if and when we prove them to be false, and the defense has in possession information that bears upon these statements. The subpoena itself, which we do not have, which they do have, and other pieces of information that they've talked about today, such as a plea agreement,

1 complaints and things of that nature.

2 And while we're going down the road of settlement
3 discussions as well, your Honor, it would help us on the
4 plaintiff's side to learn about what information that Ms. Buhl
5 has which she believes supports her statements, so that we can
6 have a full discussion of settlement and also be able to
7 prepare for the case.

8 And with the proposed scheduling order timeline,
9 there's not going to be a great deal of time to undertake
10 discovery. We're not asking for massive amounts of information
11 to be provided to us, but just things that are relevant to the
12 statements that are defamatory and Ms. Buhl is relying upon in
13 her defense.

14 THE COURT: Let me ask you this, Ms. Walz. How would
15 you feel about providing Mr. Harder with, first of all, the SEC
16 subpoena, but also the public record information that you
17 intend to rely on? That might be conducive to having a
18 rational discussion about the future of the case. I suspect
19 you'll be attaching most of these things as exhibits to your
20 papers anyway, so I don't think you're giving anything up. But
21 what do you say?

22 MS. WALZ: In terms of the subpoena, we certainly
23 planned on attaching that. And the other documents, the other
24 public documents would be referenced and attached in our motion
25 to dismiss. The document in terms of the plea agreement was

actually linked to from the journalism, from the blog, so I believe that that is publicly available. So we're not hiding the ball in any way. So I think, again, we did plan on attaching the subpoena to the motion to dismiss.

THE COURT: I'm going to stay discovery, because if discovery were to proceed, it would clearly go beyond the SEC subpoena and the public record information. And again, because I'm uncertain whether a number of these alleged defamatory statements are going to survive, I'm reluctant to have the parties spend a lot of time on discovery on it.

But what I would urge, given Ms. Walz's confirmation that the subpoena and the public record information will be attached to her papers that are going to be filed in a week and a half anyway, I would urge you, Ms. Walz, to give that stuff to Mr. Harder now so that you can start having a conversation about whether it makes any sense to pursue litigation on all or at least some of these claims. I'm not convinced it does. And I do believe that the sooner the parties begin an exchange of the sort that I've suggested, the sooner we can figure out whether there is any possibility of an amicable resolution.

So I would urge you to do that. I'm not ordering you to do that. As I said, in 10 days' time you'll file your motion and it will have presumably these materials attached anyway. I'd urge to you do it now, and I'd urge you to have conversations with Mr. Harder now. It is entirely up to you

1     whether you do or you don't.
2          For present purposes, I will enter a scheduling order
3     that provides for briefing on the schedule that we've agreed
4     to.  It will provide that discovery will be stayed pending
5     resolution of the proposed motion to dismiss.
6          Are there other issues the parties want to raise
7     today?
8          MR. HARDER:  Your Honor, if there is going to be a
9     temporary stay of discovery, then we would ask that the
10    discovery cutoff be extended so that we once the discovery stay
11    is lifted, we would have an appropriate amount of time to be
12    able to complete discovery.
13         THE COURT:  I'm not going to enter a case management
14    plan.
15         MR. HARDER:  Okay, that's fine.
16         THE COURT:  Anything else?
17         MS. WALZ:  No, your Honor.
18         THE COURT:  All right.
19                              o0o