# EXHIBIT C
## TO
## LAVERNE DECLARATION

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATG Capital LLC, Four Kids Investment Fund LLC, GRQ Consultants Inc. Roth 401k FBO Barry Honig, Barry Honig, Jonathan Honig, Melechdavid Inc., and Stetson Capital Management LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>MGT Capital Investments, Inc., John McAfee, Robert Ladd, Nolan Bushnell, H. Robert Holmes, and Michael Onghai,<br><br>Defendants. | Civil Action No. 17-cv-2440<br><br>COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

Plaintiffs ATG Capital LLC, Four Kids Investment Fund LLC, GRQ Consultants Inc. Roth 401k FBO Barry Honig, Barry Honig, Jonathan Honig, Melechdavid Inc., and Stetson Capital Management LLC (collectively, "Plaintiffs") assert claims for breach of contract, tortious interference with contractual relations, and unjust enrichment under New York law against the Defendants identified below (collectively, "Defendants").

<u>The Parties</u>

1.      Plaintiff ATG Capital LLC is a limited liability company whose only member is John O'Rourke.  O'Rourke resides in Fort Lauderdale, Florida.

2.      Plaintiff Four Kids Investment Fund LLC is a limited liability company whose managing member is Jonathan Honig.  All of its members reside in Boca Raton, Florida.

3.      Plaintiff GRQ Consultants Inc. Roth 401k FBO Barry Honig is a Florida corporation with its principal place of business in Boca Raton, Florida.

4.      Plaintiff Barry Honig is an individual residing in Boca Raton, Florida.

4873049v1.docx

1

5.      Plaintiff Jonathan Honig is an individual residing in Boca Raton, Florida.

6.      Plaintiff Melechdavid Inc. is a Florida corporation with its principal place of business in Miami Beach, Florida.

7.      Plaintiff Stetson Capital Management LLC is a limited liability company whose only member is John Stetson.  Stetson resides in Fort Lauderdale, Florida.

8.      Defendant MGT Capital Investments, Inc. ("MGT") is a Delaware corporation with its principal place of business in Durham, North Carolina.

9.      Defendant John McAfee is an individual residing in Lexington, Tennessee. McAfee is the Chief Executive Officer and Chairman of the Board of MGT.

10.      Defendant Robert Ladd is an individual residing in Chapel Hill, North Carolina. Robert Ladd is the current President and interim Chief Financial Officer of MGT, as well as its former CEO.  Ladd is also a director of MGT.

11.      Defendant Nolan Bushnell is an individual residing in Los Angeles, California. Bushnell is a director of MGT.

12.      Defendant H. Robert Holmes is an individual residing in La Quinta, California. Holmes is a director of MGT.

13.      Defendant Michael Onghai is an individual residing in New York, New York. Onghai is a director of MGT.

<u>Jurisdiction and Venue</u>

14.      The Court has original diversity jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a), because the matter in controversy exceeds the value of $75,000, exclusive of interest and costs, and is wholly between citizens of different states.

15.     Venue is proper in this judicial district under 28 U.S.C § 1391 because, until recently, Defendant MGT's only office and headquarters was located in Harrison, New York, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

<u>Factual Background</u>

16.     On approximately October 8, 2015, Plaintiffs invested in MGT Capital Investments, Inc., as a large portion of a total capital raise by MGT of $700,000.  At the time, MGT was a small company located in Harrison, New York, and specialized in online fantasy sports and social gaming websites.

17.     In April 2016, John O'Rourke (managing member of Plaintiff ATG Capital LLC) introduced MGT's founder and then-CEO, Robert Ladd, to John McAfee, the creator of the popular antivirus software bearing his name and a well-known innovator in the cybersecurity industry, to consider a potential deal between MGT and McAfee's various business interests. O'Rourke and Ladd agreed that McAfee would be a valuable addition to MGT management and his assets could help MGT develop into a leading cybersecurity firm.  In April 2016, O'Rourke, Ladd, McAfee, and other MGT and McAfee advisors met at the New York office of MGT's corporate counsel, where the parties agreed that MGT would be rebranded as a cybersecurity company led by McAfee.

18.     McAfee was involved in a cybersecurity-focused technology incubator in Alabama called Future Tense Secure Systems, Inc. ("Future Tense").  Future Tense's President, Tom Guscinski, is a longtime McAfee associate who was also present at the April 2016 meeting. The parties agreed at that meeting that MGT could start by acquiring one of Future Tense's more promising portfolio companies as a platform.  McAfee would join MGT as Chairman and CEO

to build out a leading cybersecurity company.   Upon information and belief, McAfee's wife, Janice Dyson, is the sole director of Future Tense and owns 33% of its common stock.

19.     Ladd and McAfee were enthusiastic about the opportunity that had been presented by Plaintiffs, and the parties agreed that, upon McAfee's appointment as MGT's Chairman and CEO, MGT would begin its transformation into a cybersecurity firm by acquiring certain assets and technology known as D-Vasive, an anti-spyware technology being developed for mobile devices.   Future Tense owned the D-Vasive app and technologies.   McAfee and Ladd orchestrated the spin out of D-Vasive from Future Tense through the formation of a new company, D-Vasive, Inc. ("D-Vasive"), which would then enter into binding agreements to be acquired by MGT.  But first, McAfee needed bridge funds to continue the D-Vasive business and turned to Plaintiffs for those funds.

20.     To facilitate MGT's acquisition of D-Vasive, McAfee and Ladd demanded a bridge loan of $100,000 to D-Vasive to support management salaries, fees, and costs of operations while MGT obtained shareholder approval. Sixteen separate investors purchased convertible promissory notes from D-Vasive on May 5, 2016.  Plaintiffs are seven of the sixteen investors and provided $65,340.91 of the $100,000 financing.    Plaintiffs only agreed to provide these bridge loans if they would ultimately receive equity in MGT, making sure to deposit the loans in an escrow account to be released only after D-Vasive inked an agreement with MGT.

21.     As represented by Defendants and memorialized in the Securities Purchase Agreement ("D-Vasive SPA") for notes issued to each of the Plaintiffs and other investors ("D-Vasive Notes") (collectively, the "D-Vasive Note Agreement"), note purchasers would be issued shares of common stock of MGT upon MGT's acquisition of D-Vasive.

22.     The D-Vasive Note Agreement provides that the investors could, at any time, convert their D-Vasive Notes into 8.8 million shares of D-Vasive common stock, divided on a pro rata basis according to each investor's contribution ("Voluntary Conversion").  In turn, the D-Vasive Note Agreement provides for "Mandatory Conversion" upon the occurrence of a triggering event:

> If, at any time while this Note is outstanding, the Borrower effects a transaction whereby either: (i) 100% of the issued and outstanding shares of capital stock of the Borrower are acquired, or, (ii) substantially all of the assets of the Borrower are acquired, in exchange for shares of capital stock of an acquiring corporation that has a class of stock listed on a national securities exchange, then all amounts due and owing under this Note shall be deemed converted to common stock of the Borrower or the Convertible Security at the option of the Holder on the day of such transaction based on the formula set forth in Section 4(a) hereof and subject to the limitations, set forth herein.

The D-Vasive Note Agreement further provided that, upon D-Vasive's acquisition, "the Successor Entity [MGT] shall succeed to, and be substituted for . . . all of the obligations of the Borrower [D-Vasive] under this Note . . . and the other Transaction Documents with the same effect as if such Successor Entity [MGT] had been named as Borrower [D-Vasive] therein." The parties agreed to these provisions so that MGT would consummate its acquisition of D-Vasive — in which MGT agreed to assume all of D-Vasive's obligations under the D-Vasive Note Agreement and issue MGT shares to the note purchasers — and so that MGT would complete the transactions contemplated by the parties.

23.     On May 9, 2016, as contemplated, four days after the note purchasers provided the bridge loans to D-Vasive, MGT and D-Vasive executed a binding Asset Purchase Agreement for MGT to acquire the D-Vasive technology and assume liability under the D-Vasive Note Agreement ("D-Vasive APA").  Under the D-Vasive APA, in exchange for substantially all of D-Vasive's assets, MGT agreed to pay $300,000 and issue to D-Vasive a total of 23.8 million

shares of MGT common stock.  The D-Vasive APA spelled out precisely how many shares of MGT stock were due to each of D-Vasive's investors, including "8.8 million shares" to "Holders of D-Vasive, Inc. Convertible Notes."  Plaintiffs' portion of the 8.8 million shares of MGT common stock is 5.75 million shares.

24.     MGT initially signed a Consulting Agreement with Future Tense.  Under that agreement, Future Tense would receive $250,000, plus additional cash bonuses of $250,000 and $350,000 depending on the performance of MGT's stock.

25.     Shortly after the parties executed the D-Vasive APA, McAfee proposed a second acquisition.  Demonsaw, LLC ("Demonsaw") was another cybersecurity start-up, whose technology included secure messaging and file sharing.  Demonsaw was founded by noted computer hacker and game developer Eric J. Anderson, an associate of McAfee.  Anderson, also known by his hacker name "Eijah," is well known in the industry as one of the programmers behind the popular video game Grand Theft Auto V.

26.     As with the D-Vasive acquisition, MGT and Demonsaw demanded Plaintiffs provide bridge financing to facilitate this acquisition by MGT.  Plaintiffs again arranged for a bridge loan, this time of $750,000 in the form of eight convertible promissory notes.  Plaintiffs are seven of the eight investors and were responsible for $600,000 of the $750,000 total financing.  This financing deal was executed on May 25, 2016.

27.     As with MGT's acquisition of D-Vasive, the sole reason that Plaintiffs agreed with Ladd, McAfee, and MGT to provide bridge financing to facilitate the MGT/Demonsaw acquisition was to ultimately receive additional equity in MGT.  The Securities Purchase Agreement ("Demonsaw SPA") between Demonsaw and the investors as well as the individual notes with each of the investors ("Demonsaw Notes") (collectively, the "Demonsaw Note

Agreement"), were substantially similar to the D-Vasive Agreement.  The major difference was that investors were purchasing notes convertible into 10 million shares of Demonsaw, again divided on a pro rata basis according to each investor's contribution, instead of 8.8 million shares of D-Vasive.  The parties provided for mandatory conversion of these loans into equity upon Demonsaw's acquisition by MGT.

28.     On May 26, 2016, the day after the note purchasers provided the bridge loans to Demonsaw, MGT and Demonsaw executed an Asset Purchase Agreement ("Demonsaw APA").  In exchange for substantially all of Demonsaw's assets, MGT agreed to issue the 20 million shares of MGT common stock to Demonsaw and its investors.  Anderson would become MGT's Chief Technology Officer.  As with the D-Vasive APA, the Demonsaw APA spelled out exactly how many shares were due to each of Demonsaw's investors as a result of the MGT acquisition, including 10 million shares to "Holders of Demonsaw, Inc. [sic] Convertible Notes."  Plaintiffs' allocation of the 10 million shares of MGT common stock is 8 million shares.

29.     It was only after MGT executed the D-Vasive and Demonsaw APAs that the bridge financing provided by Plaintiffs was released from the escrow accounts in which it had been deposited.  As the purpose of the bridge financing was to facilitate the D-Vasive and Demonsaw acquisitions, Plaintiffs ensured that those funds would only be available once the acquisition agreements with MGT were in place.

30.     MGT informed its shareholders of the D-Vasive and Demonsaw acquisitions in SEC 8-K filings on May 9 and May 26, 2016.  MGT's May 9, 2016, 8-K also informed shareholders that McAfee would join MGT as its Chairman and CEO.  As a result of these deals and McAfee's high profile in the industry, MGT's stock price significantly appreciated from $0.48 per share on May 9 to $4.15 on May 17, 2016, before settling generally in the $3 to $4 per

share range throughout the summer of 2016.  This stock price appreciation as a result of the proposed acquisitions created tremendous value for existing MGT shareholders and management.

31.     Robert Ladd took advantage of this jump in MGT stock price by selling his shares in MGT after putting out many press releases touting the acquisitions of D-Vasive and Demonsaw and MGT's new business focus.  Ladd personally realized significant gross proceeds as a result of his stock sales stemming from MGT's promotion of the Plaintiffs-facilitated D-Vasive and Demonsaw deals.

32.     This stock price appreciation also resulted in tremendous return for McAfee personally, through his wife's position as sole director and 33% equity owner of Future Tense. Upon information and belief, because both milestones related to MGT stock price as outlined in Future Tense's Consulting Agreement with MGT were met following a multitude of press releases touting the pending D-Vasive and Demonsaw acquisitions, MGT paid McAfee's Future Tense $600,000 in bonuses in addition to the base compensation of $250,000.

33.     On June 7, 2016, McAfee arranged for his associate Nolan Bushnell to be appointed to MGT's Board as an independent director, thus increasing his hold on MGT.

34.     MGT sought and obtained shareholder approval for the D-Vasive and Demonsaw acquisitions on September 9, 2016.  In its August 15, 2016, proxy statement, MGT made eight proposals, including authorization for the issuance of 43.8 million shares to close the D-Vasive/Demonsaw acquisitions,[1] as well as the appointment of John McAfee and Robert Ladd's

---

[1] In July 2016, MGT arranged for D-Vasive to acquire Demonsaw, and amended the D-Vasive APA to account for this acquisition.  Importantly, the amended D-Vasive APA again explicitly accounted for the 10 million shares of MGT stock to be allocated to the "Holders of Demonsaw,

transition from CEO to President.  McAfee and Ladd rewarded themselves with generous compensation packages for their new roles, including the immediate issuance of 2 million shares of MGT to Ladd and substantial stock options for McAfee.  MGT structured its proxy statement to separate approval of McAfee's new employment agreement from the D-Vasive and Demonsaw acquisitions, even though McAfee's appointment as Chairman and CEO was premised upon those deals.

35.     On September 9, 2016, MGT's shareholders approved six of MGT's proposals, including the D-Vasive and Demonsaw acquisitions and the McAfee and Ladd appointments and associated employment agreements.  MGT was thus obligated to close the D-Vasive and Demonsaw acquisitions as of September 9, 2016, and issue 13.75 million shares of MGT stock (sum of the 5.75 million due for the D-Vasive acquisition and 8 million due for the Demonsaw acquisition) to Plaintiffs under the Mandatory Conversion provisions in the D-Vasive and Demonsaw Note Agreements and associated APAs and should have done so.  Despite multiple demands to close, MGT refused to do so, giving a slew of excuses while publically touting the value of the acquisitions.

36.     MGT publicly proceeded as if the acquisitions had been completed, but MGT did not formally close the deals.  Soon after the September 9 vote, MGT announced in a press release that it would host a conference call with the investment community led by "John McAfee, Executive Chairman, Eijah Anderson, Chief Technology Officer, and Robert Ladd, President and Interim CFO."  Anderson's appointment as MGT's CTO was contingent on MGT closing the Demonsaw acquisition.  MGT did not do that, even as it promoted Anderson as its

---

LLC Convertible Notes" and the 8.8 million shares of MGT stock to be allocated to the "Holders of D-Vasive Inc. Convertible Notes."

CTO and, on information and belief, paid him for those duties.  MGT opened a new office in Durham, North Carolina, transferred its headquarters there, and consolidated key D-Vasive and Demonsaw personnel and operations in this new Durham headquarters.  MGT updated its website to tout the company's new cybersecurity focus, as well as promote D-Vasive and Demonsaw products and technologies.  Throughout this time, MGT issued a myriad of press releases promoting its new cybersecurity focus, McAfee's and Anderson's involvement, and the D-Vasive and Demonsaw deals.  McAfee himself widely publicized MGT's new acquisitions in the tech media — in particular, describing its Demonsaw technology as a disruptive technology that would wholly transform the industry.  In one article, he boasted that Demonsaw represented "the next iteration of the internet . . . that will make the cloud completely obsolete."  It was all a façade to promote the stock for the benefit of Ladd, McAfee, and MGT while they never had any intention of honoring or closing the binding definitive agreements that they had executed.  As early as July 2016, Anderson was quoted as saying the sentiment in the MGT office and among MGT management was that Plaintiffs were getting "too good of a deal."

37.    MGT implemented the other proposals approved by shareholders.  McAfee was appointed Chairman and CEO; Ladd issued to himself 2 million shares of MGT promised by his new employment agreement.  Both of these actions were tied to the transaction with D-Vasive and Demonsaw.  While MGT's Board and management unjustly enriched themselves and profited handsomely from the deals that Plaintiffs facilitated in the first place, MGT failed to issue the MGT shares owed to Plaintiffs.

38.    On October 13, 2016, note purchasers O'Rourke and Barry Honig met with McAfee at MGT's new office in Durham, North Carolina.  O'Rourke and Honig were stunned by a demand.  On a whiteboard was the number "$11.655 million" and nothing else.  McAfee

told the investors that they needed to gather an additional $11.655 million and invest it in MGT at $1.50 per share or else MGT would not close the D-Vasive and Demonsaw acquisitions.

39.     According to McAfee, Plaintiffs had made "too good of a deal" when they facilitated the D-Vasive and Demonsaw acquisitions in May.  The surge in MGT stock price after MGT announced those deals resulted in the equity owed to Plaintiffs having a market value of $46.75 million.[2]  MGT apparently could not stomach allowing Plaintiffs to achieve this profit, even though these were the terms agreed upon by all parties, and the MGT's newly enhanced value was the direct result of Plaintiffs' efforts and willingness to support its acquisitions of D-Vasive and Demonsaw.

40.     Immediately after the October 2016 meeting with McAfee, Honig and O'Rourke met with Ladd, who informed them that McAfee's position had been endorsed by the MGT Board.  Anderson later confirmed to Plaintiffs that MGT's management and Board were fully aligned on this approach, as no one at MGT wanted to issue Plaintiffs the shares.

41.     McAfee then made MGT's position clear over text message the next day.  He told Plaintiffs that, should they fail to give him a satisfactory term sheet for the new $11.655 million investment:

> If it wastes my time reading, I promise you it will be the last time that you and I ever speak, and if it one dollar less than my bottom line, and even if it meets or exceeds my bottom line, I cannot guarantee, until next week, that I will accept it.

MGT had no intention of closing the D-Vasive and Demonsaw deals so that Plaintiffs could receive their MGT shares, and in fact, seemed intent only on extracting as much money as possible from Plaintiffs while manipulating the price of their stock for personal gain.

---

[2] Based on MGT's closing share price of $3.40 on September 9, 2016, the day that MGT shareholders approved the acquisitions and when MGT's obligation to close was triggered.

42.     Honig and O'Rourke sought clarity in writing of McAfee's demand, including confirmation that the acquisitions had received all necessary approvals to close and that MGT had the ability to close the deals and issue Plaintiffs their shares.  O'Rourke wrote back to McAfee, asking for confirmation of McAfee's offer:

> My understanding is that MGT will delist onto the QX or bulletin board and close the deal as originally agreed upon and voted upon by shareholders.  In exchange, Barry [Honig] will commit to funding the company at $1.50/share

McAfee replied: "Yes."

43.     Plaintiffs did not agree to MGT's newly created conditions.  Plaintiffs instead sought to convince MGT through Ladd to honor its obligations and close on the transactions and issue the shares they were owed.  When McAfee learned of these communications, he made further threats against Plaintiffs:

> Stop harassing my people.  There will be NO DEAL under any fucking circumstances, at ANY fucking price now.  Do not not [sic] ever contact me again.  If a term sheet is sent to Rob, I will instruct him not to read it.

44.     In November 2016, Ladd approached John Stetson (managing member of Plaintiff Stetson Capital Management, LLC) with a similar proposal as the one McAfee had presented in October.  The proposal this time was for Plaintiffs to pay an additional $3.75 million at $1.25 per share of MGT.  Ladd acknowledged that this proposal was unfair to Plaintiffs, writing to Stetson: "If anything, the company is squeezing your balls."  Stetson did not accept this proposal.

45.     Plaintiffs continued to ask Ladd to intercede, as seen in text messages exchanged between Ladd and Honig over the next months.  For instance, in a text message sent on January 1, 2017, Honig asked Ladd to help "get things sorted out":

> Thanks Rob Appreciate let's sit down in a couple of weeks and see how we can get things sorted out and have a win win for every body . Wish you and your loved ones all the best for 17

Two weeks later, Ladd reported back to Honig that it "[m]ight be another few days" before he had another proposal, but in the meantime, he was "[b]eating up Eijah." Ladd provided no more details, only that it would be an "[i]nteresting story when this is over."

46.     On January 25, 2017, Honig and Mark Groussman (President of Plaintiff Melechdavid Inc.) met with Ladd at the Peninsula Hotel in Manhattan, New York. Instead of agreeing to honor MGT's existing obligation to close the D-Vasive and Demonsaw acquisitions, Ladd continued the strategy begun by McAfee, though again lowering MGT's asking price, this time to $3 million at $0.75 per share. Ladd confirmed that this latest demand came directly from MGT's Board. Incredibly, Ladd intimated they would prefer to issue the almost 15 million shares owed to Plaintiffs to other investors, as a way of obtaining additional cash for MGT. Honig and Groussman did not accept this revised proposal.

47.     Then, on March 3, 2017, Plaintiffs were shocked to read a press release announcing that MGT "has acquired a 46% equity interest in Demonsaw LLC" pursuant to a new agreement whereby MGT would issue "2.0 million shares rather than the 43.8 million originally approved." These revised terms were targeted at Plaintiffs to deprive them of their consideration under the Demonsaw Note Agreement and to take control of Demonsaw without any payment to Plaintiffs and the other noteholders. In MGT's own words, the Demonsaw acquisition "concludes events begun in May 2016 and allows the Company to reap the upside of promising technology *with very minimal dilution*." (emphasis added). MGT and its Board did not articulate any such complaints about dilution when they needed Plaintiffs' investment to facilitate this transaction and originally approved the issuance of 43.8 million shares. MGT did not announce the terms, if any, of its new arrangement with Anderson.

48.     Conspicuously, MGT did not announce that it had also renegotiated a deal with D-Vasive.   MGT's press releases and website no longer claim that it is "in the process" of acquiring D-Vasive.   Unlike it did with Anderson, MGT was not able to "beat up" D-Vasive's owners into accepting a side deal for far less than the original acquisition was worth.

49.     MGT has also contacted other stakeholders in D-Vasive and Demonsaw, including Joshua Silverman, the managing member of Iroquois Capital Management LLC ("Iroquois"), in an attempt to negotiate similar side deals.   Iroquois was another of the sixteen bridge financing investors in the original D-Vasive Note Agreement.

50.     To this day, Plaintiffs have not seen a single penny for the money they invested in the transformation of MGT from an obscure online gaming start-up to an emerging cybersecurity and disruptive technology company.   MGT and its directors and officers — McAfee, Ladd, Bushnell, Holmes, and Onghai (collectively, the "Individual Defendants") — have sought to deprive Plaintiffs of the benefit of their bargain, while reaping significant returns on their own stock in MGT.

51.     By failing to close on these acquisitions as required, MGT caused a major depreciation in MGT's stock price.   MGT's stock price had appreciated from $0.48 per share to the $3 to $4 per share range because it announced the D-Vasive and Demonsaw acquisitions and the involvement of McAfee and Anderson.   MGT's stock continued to trade in this $3 to $4 price range until mid-September 2016, when MGT was supposed to issue Plaintiffs' shares and close on the acquisitions.   MGT's failure to close raised question marks from MGT's shareholder base. MGT's action and inaction may have further damaged Plaintiffs because the MGT shares they are owed are now worth substantially less than what they were worth and would have been worth if MGT properly and timely had closed the acquisitions upon obtaining shareholder approval.

I.
Tortious Interference with Contractual Relations
Against All Defendants

52.     Plaintiffs incorporate here all preceding paragraphs of this Complaint.

53.     A Note Agreement exists between Plaintiffs and D-Vasive, pursuant to which D-Vasive is to convert all amounts owed under the notes between Plaintiffs and D-Vasive into common stock upon D-Vasive's acquisition.

54.     A Note Agreement exists between Plaintiffs and Demonsaw, pursuant to which Demonsaw is to convert all amounts owed under the notes between Plaintiffs and Demonsaw into common stock upon Demonsaw's acquisition.

55.     Defendants had actual knowledge of the D-Vasive and Demonsaw Note Agreements, as Plaintiffs facilitated MGT's acquisition of both companies and provided bridge financing to D-Vasive and Demonsaw upon MGT's request.   The D-Vasive and Demonsaw APAs specifically account for the MGT shares owed to Plaintiffs as a result of those acquisitions.   The bridge loans provided by Plaintiffs for both acquisitions were held in escrow accounts, and were not released until after MGT executed the D-Vasive and Demonsaw APAs.

56.     Defendants have intentionally caused D-Vasive and Demonsaw to breach their Note Agreements with Plaintiffs by refusing to close the MGT/D-Vasive and MGT/Demonsaw acquisitions, thus preventing D-Vasive and Demonsaw from converting the amounts owed under the D-Vasive and Demonsaw Notes into stock.   There was no impediment to closing these two transactions after MGT's shareholders approved them on September 9, 2016.   Defendants

acknowledged that there was no legitimate bar to closing when they offered to go through with it if Plaintiffs injected more money into MGT.[3]

57.    But for the actions of Defendants, D-Vasive and Demonsaw would have performed under their contracts with Plaintiffs, as those entities were ready and willing to close on the MGT acquisition.

58.    The tortious conduct of Defendants has caused damages of at least $46,750,000 to Plaintiffs, as Plaintiffs were deprived of the value of the 5.75 million shares of MGT they should have received as a result of the D-Vasive acquisition and the value of the 8 million shares of MGT they should have received as a result of the Demonsaw acquisition.

## II.
## Breach of Contract Against MGT

59.    Plaintiffs incorporate here all preceding paragraphs of this Complaint.

60.    A contract exists between MGT and D-Vasive to which Plaintiffs are third-party beneficiaries.  That D-Vasive APA explicitly provides that Plaintiffs, as "D-Vasive's designees shall have a right to receive the Common Shares constituting the Purchase Price," as a result of D-Vasive's acquisition by MGT, and moreover spelled out the MGT shares to be allocated to

---

[3] MGT's recent claim that it did not close the D-Vasive and Demonsaw acquisitions because "the critical condition of closing — approval by NYSE MKT — was not met" is belied by MGT's own words and actions.  In a November 4, 2016, press release, MGT announced that "it plans to move ahead with the shareholder approved Asset Purchase Agreement . . . for D-Vasive, which includes the acquisition of Demonsaw," and that its "Board of Directors is determined to not permit the actions of the NYSE to derail the Company's commitment to building an innovative cybersecurity company."   NYSE approval was never required to close these transactions, as MGT itself acknowledged in that same press release, when it announced that it would close the deals and be listed on the OTCQB.  Losing the NYSE listing would have presented a potential out only for the Sellers under the D-Vasive and Demonsaw APAs, *i.e.*, D-Vasive and Demonsaw, not the Buyer, *i.e.*, MGT.  The reason for the deals' failure to close was that Plaintiffs did not succumb to Defendants' attempts to exert pressure on Plaintiffs to change the terms of the original deals that were executed and received all necessary approvals to close.

Plaintiffs.   Upon amendment of the D-Vasive APA to account for D-Vasive acquisition of Demonsaw, MGT again affirmed the MGT shares to be allocated to Plaintiffs, this time accounting for shares owed as a result of both the D-Vasive and Demonsaw acquisitions.

61.     MGT was required to close the D-Vasive acquisition upon approval by MGT's shareholders.  The D-Vasive APA provided that "the closing of the transactions contemplated by this Agreement (the 'Closing') ***shall*** take place such date when each of the conditions set forth in this Article III have been satisfied or waived." (emphasis added).

62.     MGT did not close the D-Vasive acquisition upon shareholder approval, thus breaching its obligations under the D-Vasive APA.

63.     The D-Vasive APA contains an implied covenant that MGT will act in good faith and deal fairly with Plaintiffs as third-party beneficiaries, and that MGT shall do nothing that will have the effect of destroying or injuring the right of Plaintiffs to receive the fruits of the contract.

64.     MGT breached the implied covenant of good faith and fair dealing by refusing to close the D-Vasive acquisition and issue Plaintiffs the stock to which they were entitled, unless Plaintiffs injected additional cash into MGT.  Through its officers and directors McAfee and Ladd, MGT repeatedly told Plaintiffs that the only reason it did not close the acquisitions was to deny Plaintiffs the shares of MGT that they were owed.  MGT's later renegotiation of the terms of the Demonsaw acquisition specifically to achieve "very minimal dilution" — *i.e.*, keeping MGT's stock out of Plaintiffs' hands — is yet more evidence of MGT's bad faith.

65.     As a result of these breaches of contract, including by breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages of at least $46,750,000,

as Plaintiffs were deprived of the value of the 13.75 million shares of MGT they should have received as a result of MGT's acquisition of D-Vasive (and through D-Vasive, Demonsaw).

<div align="center">

III.

<u>Unjust Enrichment Against All Defendants</u>

</div>

66.     Plaintiffs incorporate here all preceding paragraphs of this Complaint.

67.     Plaintiffs have expended considerable time and money in facilitating the transformation of MGT from an obscure online gaming start-up to an emerging leader in cybersecurity, including, but not limited to, introducing McAfee to MGT, arranging for McAfee to join MGT, providing $65,340.91 of bridge financing to D-Vasive to facilitate the closing of the MGT/D-Vasive acquisition, and providing $600,000 of bridge financing to Demonsaw to facilitate the closing of the MGT/Demonsaw acquisition.

68.     MGT did not have any expertise in cybersecurity prior to Plaintiffs' efforts, but rather received the benefit of Plaintiffs' development efforts when it joined with McAfee to acquire D-Vasive and Demonsaw.  Without Plaintiffs' efforts, MGT would not have experienced a rise in stock price from $0.48 per share on May 9, 2016, to $3.40 per share on September 9, 2016, when MGT's acquisitions were approved.

69.     The Individual Defendants also benefited from Plaintiffs' efforts, as each was a shareholder of MGT at the time MGT's stock price skyrocketed.  Not only did they benefit from an increase in the value of their MGT stock, but also they benefited from wrongfully retaining the 13.75 million shares to which Plaintiffs were entitled, thus keeping their equity in MGT undiluted.  Robert Ladd secured  immense personal gain from the sale of a significant amount of MGT stock in the summer of 2016, a benefit arising from the increase in MGT's stock price as the market reacted to news of the Demonsaw and D-Vasive acquisitions facilitated by Plaintiffs.  McAfee, through his wife's affiliation with Future Tense, reaped a $600,000 bonus upon MGT's

stock price increase.  This benefit derived directly from Plaintiffs' facilitation of the D-Vasive and Demonsaw acquisitions and the bridge loans they made to close those deals.  Future Tense, as merely a vehicle for McAfee's own personal enrichment, did nothing to warrant the payment it received.

70.     It would be against equity and good conscience for the Defendants to be permitted to retain the benefits which they received at Plaintiffs' expense, which include but are not limited to the amounts Plaintiffs have spent and the value of the 13.75 million shares to which Plaintiffs are entitled but that Defendants have wrongfully retained.

<div align="center">Prayer for Relief</div>

Plaintiffs respectfully request that this Court enter Judgment in their favor and against Defendants in (a) an amount of $46,750,000, (b) together with interest, costs and reasonable attorneys' fees as provided by law and relevant agreements, and (c) any further or different relief as this Court deems lawful and proper under the circumstances.

<div align="center">Jury Demand</div>

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: April 4, 2017

<div style="margin-left: 50%;">

s/ Shawn J. Rabin
Geoffrey L. Harrison (GH7807)
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Tel: 713-651-9366
Fax: 713-654-6666
gharrison@susmangodfrey.com

Shawn J. Rabin (SR6546)
Geng Chen (GC2733)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019-6023
Tel.: 212-336-8330
Fax: 212-336-8340
srabin@susmangodfrey.com
gchen@susmangodfrey.com

*Attorneys for Plaintiffs*

</div>