# EXHIBIT 2
# to Wolff Declaration

MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

BENJAMIN KINGSLEY (NYBN 4758389)
Assistant United States Attorney
  450 Golden Gate Avenue, Box 36055
  San Francisco, California 94102-3495
  Telephone: (415) 436-6937
  FAX: (415) 436-7234
  benjamin.kingsley@usdoj.gov

Attorneys for the United States

**FILED**

JUN 2 3 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,            ) NO. CR 14-264 VC
                                     )
        Plaintiff,                   ) PLEA AGREEMENT
                                     )
   v.                                )
                                     )
JOSEPH NOEL,                         )
                                     )
        Defendant.                   )
_____)

I, Joseph Noel, and the United States Attorney's Office for the Northern District of California (hereafter "the government") enter into this written plea agreement (the "Agreement") pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

The Defendant's Promises

1.  I agree to plead guilty to the first and only count of the captioned Information charging me with securities fraud, in violation of 18 U.S.C. § 1348. I agree that the elements of 18 U.S.C. § 1348 are as follows: (1) I knowingly and willfully engaged in a scheme or plan (a) to defraud, or (b) for obtaining money or property by making false promises or statements; (2) I knew that the promises or statements were false; (3) I knew the promises or statements were material because they would reasonably influence a person to part with money or property; (4) I acted with intent to defraud; and (5) An essential part of my scheme was in connection with any security, to wit, securities of YesDTC

PLEA AGREEMENT
CR 14-264 VC

Holdings, Inc.

I agree that the maximum penalties for 18 U.S.C. § 1348 are as follows:

a. a maximum prison term of twenty-five (25) years;

b. a maximum fine of $250,000 or twice the gross gain or loss, whichever is greater;

c. a maximum term of supervised release of five (5) years;

d. restitution in an amount to be determined by the Court; and

e. a mandatory special assessment of $100.

I acknowledge that pleading guilty may have consequences with respect to my immigration status if I am not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, which may include the offense to which I am pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and I understand that no one, including my attorney or the district court, can predict to a certainty the effect of this conviction on my immigration status. I nevertheless affirm that I want to plead guilty regardless of any immigration consequences that may result from my guilty plea, even if the consequence is my automatic removal from the United States.

2. I agree that I am guilty of the offenses to which I am pleading guilty, and I agree that the following facts are true:

Beginning in 2005, I worked as a business consultant for small cap companies in and around San Francisco, California. In 2009, I helped create a partnership, Allay Online Marketing, which owned the distribution rights for various products. Allay Online had an initial capitalization of approximately $206,667. As managing partner, I received a 25% ownership interest in Allay Online, which I put into Sonoma Winton, LLC, an entity that was held in my daughter's name. At the time, my intention was to introduce my daughter to the business world. In June 2010, I instructed my daughter to open a bank account for Sonoma Winton.

In the fall of 2009, I met Barry Honig, who I understood was a large investor in small cap companies. Later that fall, Honig suggested that we do a reverse merger to create a publicly traded company to take control of Allay Online's assets and that I be CEO of the new company. I was very

PLEA AGREEMENT
CR 14-264 VC                                    2

excited with this opportunity. Honig had the experience and resources to implement the reverse merger. He proposed that we utilize PR Complete Holdings, Inc., a publicly held shell company that Honig controlled, and that is what we did. Honig's attorneys drew up all of the relevant documents. In December 2009, the reverse merger was implemented, creating a new company called YesDTC Holdings, Inc. ("YesDTC"), which issued approximately 140,000,000 shares of restricted and unrestricted stock to Honig, me, and others. I also invested about $85,000 and received about 7,500,000 unrestricted shares, about 50,000,000 restricted shares, and convertible debt.

I caused all of my unrestricted shares in YesDTC to be issued to Sonoma Winton, which was still held in my daughter's name. I knew at the time that the SEC imposed restrictions on the sale of stock by a company's corporate officers, like me. I later learned that these restrictions are set forth in SEC Rule 144. I put my unrestricted YesDTC shares into Sonoma Winton because I wanted to evade the SEC restrictions on the sale of securities by an officer.

Over the next twenty-two (22) months, I used my daughter to sell YesDTC stock through Sonoma Winton and to evade the SEC's disclosure rules. I made the decisions when to sell stock. I contacted the brokers and gave instructions about what stock to sell, often, but not always, with my daughter on the line. I possessed the passwords to Sonoma Winton's online bank account, and I decided how the proceeds from the sales of YesDTC stock would be spent without consulting my daughter. In short, I used my daughter as a nominee to evade the SEC restrictions on the sale of securities by an officer. By doing so, I engaged in a scheme to defraud shareholders of YesDTC by pretending to comply with the SEC's disclosure rules restricting sales of securities by corporate officers like me when, in fact, I was secretly evading those disclosure rules.

During 2010, I worked hard as CEO to make YesDTC a successful enterprise. However, I soon realized that it was not Honig's priority to make YesDTC successful. Instead, I realized that Honig wanted to use promotions to drive up the price of YesDTC shares and then sell his shares. Honig introduced me to David Zazoff who Honig said would promote YesDTC stock. Honig said that Zazoff was a "magic maker," who could make the price of YesDTC stock rise through his services. Honig made it clear that I should not ask questions about how Zazoff achieved his success.

In the spring of 2010, Zazoff promoted YesDTC stock. Aware of Zazoff's efforts, I also caused

PLEA AGREEMENT
CR 14-264 VC

3

YesDTC to issue two press releases announcing positive news. I told Zazoff in advance that I would make those press releases. The price of YesDTC stock rose significantly during May 2010. I took advantage of Zazoff's promotion of YesDTC by causing Sonoma Winton to sell YesDTC stock, from which I deposited approximately $57,550 of the proceeds in the Sonoma Winton bank account. By doing so, I used Sonoma Winton and my daughter as nominees to evade the SEC restrictions on the sale of securities by an officer. At Honig's direction I caused Sonoma Winton to send $45,000 of the proceeds to Zazoff as partial compensation for his promotion of YesDTC stock.

In January 2011, Zazoff conducted a second promotion of YesDTC stock. At Honig's direction, I caused YesDTC to compensate Zazoff for the January 2011 promotion of its stock.

Also during that month, I caused YesDTC to issue several press releases announcing positive news. For example, in a press release dated January 11, 2011, I stated that I, the CEO of the company, had purchased 7.1 million shares of stock. By doing so, I wanted to convey my confidence in the company's long term prospects. But the press release was misleading because, in fact, I did not actually purchase any shares. Instead, I received restricted shares in exchange for the cancelation of short term loans I had made to YesDTC. And, in fact, I later sold other shares as soon as the positive news in the press releases helped raise the price of the stock.

In this time period, there were at least two other press releases that contained factual misstatements. A January 20, 2011 press release stated that YesDTC possessed exclusive worldwide rights to distribute a product called "Nutrifusion," when, in fact, our distribution rights were limited to specific geographic regions.

A January 28, 2011 press release erroneously stated that the EPA had certified that another of our products, "MotorBooster," did not cause engine damage, when, in fact, the product had only been registered with the EPA.

In addition, a January 31, 2011 press release stated that YesDTC would begin marketing a product called "WordSmart" in China, when, in fact, YesDTC's agreement with WordSmart authorized YesDTC to market the product only in English-speaking countries.

As a result of these press releases and Zazoff's promotions, the price of YesDTC stock rose significantly during January 2011. When it did, I took full advantage of the price rise by causing

PLEA AGREEMENT
CR 14-264 VC

4

Sonoma Winton to sell approximately 5,570,000 shares of YesDTC stock in January and early February 2011, from which I deposited approximately $239,500 of proceeds in the Sonoma Winton bank account. This was stock that I knew I was prohibited from selling without properly disclosing and registering the shares in advance of the sale which I did not do. Again, I used Sonoma Winton and my daughter as nominees to evade the SEC restrictions on the sale of securities by an officer. By doing so, I engaged in a scheme to defraud shareholders of YesDTC because those shareholders were entitled to know whether the CEO of YesDTC was secretly selling shares in their company.

In July 2011, Zazoff conducted a third promotion of YesDTC stock. Again, I caused YesDTC to issue two press releases announcing positive news during that month. Again, the price of YesDTC stock rose significantly during July 2011. And again, I took advantage of the promotion of YesDTC by illegally causing Sonoma Winton to sell YesDTC stock, from which I deposited approximately $68,199 of proceeds in the Sonoma Winton bank account. To do this, I again used Sonoma Winton and my daughter as nominees to evade the SEC restrictions on the sale of securities by an officer. Honig instructed me to cause YesDTC to send compensation to Zazoff for the July 2011 promotion of its stock, but I refused.

I received a total of approximately $367,221 in proceeds from my illegal sales of YesDTC stock as set forth above. Most of this money I reinvested in YesDTC. But I acknowledge that I personally made a profit from these illegal stock sales of at least $55,855, which I am now prepared to forfeit.

I knew that it was wrong to use my daughter as a nominee to avoid the SEC's restrictions on the sales of stock by a corporate officer. I knew that it was wrong to sell my shares when the YesDTC stock price was artificially high as a result of the promotional efforts of David Zazoff and me.

3. I agree to give up all rights that I would have if I chose to proceed to trial, including the rights to a jury trial with the assistance of an attorney; to confront and cross-examine government witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth Amendment claims; to any further discovery from the government; and to pursue any affirmative defenses and present evidence.

4. I agree to give up my right to appeal my conviction, the judgment, and orders of the Court. I also agree to waive any right I have to appeal any aspect of my sentence, including any orders

relating to forfeiture and or restitution. I also agree to give up any right I may have to appeal my sentence, except that I reserve my right to appeal an upward departure from the Guideline imprisonment range determined by the Court or an upward variance under 18 U.S.C. § 3553(a).

5. I agree not to file any collateral attack on my conviction or sentence, including a petition under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, except that I reserve my right to claim that my counsel was ineffective in connection with the negotiation of this Agreement or the entry of my guilty plea. I also agree not to seek relief under 18 U.S.C. § 3582.

6. I agree not to ask the Court to withdraw my guilty plea at any time after it is entered. I understand that by entering into this Agreement: (a) I agree that the facts set forth in Paragraph 2 of this Agreement shall be admissible against me under Fed. R. Evid. 801(d)(2)(A) in any subsequent proceeding, including at trial, in the event I violate any of the terms of this Agreement, and (b) I expressly waive any and all rights under Fed. R. Crim. 11(f) and Fed. R. Evid. 410 with regard to the facts set forth in Paragraph 2 of this Agreement in any such subsequent proceeding. I understand that the government will not preserve any physical evidence obtained in this case.

7. I agree that the Court will use the Sentencing Guidelines to calculate my sentence. I understand that the Court must consult the Guidelines and take them into account when sentencing, together with the factors set forth in 18 U.S.C. § 3553(a). I also understand that the Court is not bound by the Guidelines calculations below, the Court may conclude that a higher Guidelines range applies to me, and, if it does, I will not be entitled, nor will I ask to withdraw my guilty plea. I also agree that regardless of the sentence that the Court imposes on me, I will not be entitled, nor will I ask, to withdraw my guilty plea. I further agree that, other than seeking a possible downward departure pursuant to U.S.S.G. § 5K1.1 and/or 18 U.S.C. § 3553(e), I will not ask for any other adjustment to or reduction in the offense level or for a downward departure or variance from the Guidelines range as determined by the Court. But I also reserve my right to argue for a variance from the Guidelines range determined by the Court based on 18 U.S.C. § 3553(a) factors. I understand that the government may oppose this argument. The parties have reached no agreement regarding my Criminal History Category.

I agree that the Sentencing Guidelines offense level will be calculated as follows, with the exception of the following: I reserve the right to argue that the loss or gain amount under U.S.S.G.

PLEA AGREEMENT
CR 14-264 VC                                6

§ 2B1.1(b)(1) is approximately $55,855, resulting in a six-point increase, whereas the government may argue for a higher loss or gain amount, including a gain or loss of up to approximately $367,000, resulting in a twelve-pointed increase, and I reserve the right to argue that there were between 50 and 250 victims of my scheme under U.S.S.G. § 2B1.1(b)(2), resulting in a four-point increase, whereas the government may argue that there were greater than 250 victims, resulting in a six-point increase.

I agree that the loss or gain amount is between $55,855 and $367,000. I therefore agree that the Guidelines offense level is as follows:

a. Base Offense Level, U.S.S.G. § 2B1.1(a)(1):  +7

b. Specific offense characteristics:

    Loss, U.S.S.G. § 2B1.1(b)(1)
    (loss or gain of between $55,855
    and $367,221)  +6 to +12

    Victims, U.S.S.G. § 2B1.1(b)(2)
    (50 or more victims)  +4 or +6

    Officer, U.S.S.G. § 2B1.1(b)(18)(A)(i)
    (officer of a publicly-traded company)  +4

c. Acceptance of Responsibility:

    If I meet the requirements of U.S.S.G. § 3E1.1
    through sentencing, then I may be entitled to a
    three (3) level reduction  -3

d. Adjusted Offense Level:  18 to 26

8. I agree that regardless of any other provision of this Agreement, the government may and will provide the Court and the Probation Office with all information relevant to the charged offense and the sentencing decision.

9. I agree to pay restitution for all the losses caused by all the schemes or offenses with which I was charged in this case, and I agree that the amount of restitution will not be limited to the loss attributable to the count to which I am pleading guilty, pursuant to 18 U.S.C. § 3663(a)(3). I agree that the Court may order and I will pay restitution in an amount to be determined by the Court. I agree that any fine, forfeiture, or restitution imposed by the Court against me will be immediately due and payable and subject to immediate collection by the government and I understand that the government may seek immediate collection of the entire fine, forfeiture, or restitution from any assets without regard to any

PLEA AGREEMENT
CR 14-264 VC                                        7

schedule of payments imposed by the Court or established by the Probation Office. I agree that I will make a good faith effort to pay any fine, forfeiture, or restitution I am ordered to pay. Before or after sentencing, I will upon request of the Court, the government, or the Probation Office, provide accurate and complete financial information, submit sworn statements and give depositions under oath concerning my assets and my ability to pay, surrender assets I obtained as a result of my crimes, and release funds and property under my control in order to pay any fine, forfeiture, or restitution. I agree to pay the special assessment at the time of sentencing.

10. I agree to cooperate with the U.S. Attorney's Office before and after I am sentenced. My cooperation will include, but will not be limited to, the following:

 a. I will respond truthfully and completely to any and all questions put to me, whether in interviews, before a grand jury or at any trial or other proceeding;

 b. I will provide all documents and other material asked for by the government;

 c. I will testify truthfully at any grand jury, court or other proceeding as requested by the government;

 d. I will surrender any and all assets acquired or obtained directly or indirectly as a result of my illegal conduct;

 e. I will request continuances of my sentencing date, as necessary, until my cooperation is completed;

 f. I will not reveal my cooperation, or any information related to it, to anyone without prior consent of the government.

 g. I will participate in undercover activities under the supervision of law enforcement agents or the U.S. Attorney's Office.

11. I agree that the government's decision whether to file a motion pursuant to U.S.S.G. § 5K1.1, as described in the government promises section below, is based on its sole and exclusive decision of whether I have provided substantial assistance and that decision will be binding on me. I understand that the government's decision whether to file such a motion, or the extent of the departure recommended by any motion, will not depend on whether convictions are obtained in any case. I also understand that the Court will not be bound by any recommendation made by the government.

12. I agree not to commit or attempt to commit any crimes before sentence is imposed or before I surrender to serve my sentence. I also agree not to violate the terms of my pretrial release; not

PLEA AGREEMENT
CR 14-264 VC                                        8

to intentionally provide false information to the Court, the Probation Office, Pretrial Services, or the government; and to comply with any of the other promises I have made in this Agreement. I agree that if I fail to comply with any promises I have made in this Agreement, then the government will be released from all of its promises in this Agreement, including those set forth in the Government's Promises Section below, but I will not be released from my guilty plea.

13. If I am prosecuted after failing to comply with any promises I made in this Agreement, then (a) I agree that any statements I made to any law enforcement or other government agency or in Court, whether or not made pursuant to the cooperation provisions of this Agreement, may be used in any way; (b) I waive any and all claims under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal statute or rule, to suppress or restrict the use of my statements, or any leads derived from those statements; and (c) I waive any defense to any prosecution that it is barred by a statute of limitations, if the limitations period has run between the date of this Agreement and the date I am indicted.

14. I agree that this Agreement contains all of the promises and agreements between the government and me, and supersedes any other agreements, written or oral. No modification of this Agreement shall be effective unless it is in writing and signed by all parties.

15. I agree that the Agreement binds the U.S. Attorney's Office for the Northern District of California only, and does not bind any other federal, state, or local agency.

The Government's Promises

16. The government agrees not to file any additional charges against the defendant that could be filed as a result of the investigation that led to the captioned Information.

17. The government agrees to recommend the Guideline calculations set out above unless the defendant violates the terms of the Agreement above or fails to accept responsibility.

18. The government agrees not to use any statements made by the defendant pursuant to this Agreement against him, unless the defendant fails to comply with any promises in this Agreement.

19. If, in its sole and exclusive judgment, the government decides that the defendant has cooperated fully and truthfully, provided substantial assistance to law enforcement authorities within the meaning of U.S.S.G. § 5K1.1, and otherwise complied fully with this Agreement, it will file with the

PLEA AGREEMENT
CR 14-264 VC                                            9

Court a motion under § 5K1.1 and/or 18 U.S.C. § 3553 that explains the nature and extent of the defendant's cooperation and recommends a downward departure.

The Defendant's Affirmations

20. I confirm that I have had adequate time to discuss this case, the evidence, and the Agreement with my attorney and that my attorney has provided me with all the legal advice that I requested.

21. I confirm that while I considered signing this Agreement, and at the time I signed it, I was not under the influence of any alcohol, drug, or medicine that would impair my ability to understand the Agreement.

22. I confirm that my decision to enter a guilty plea is made knowing the charge that has been brought against me, any possible defenses, and the benefits and possible detriments of proceeding to trial. I also confirm that my decision to plead guilty is made voluntarily, and no one coerced or threatened me to enter into this Agreement.

Dated: June 23, 2014

JOSEPH NOEL
Defendant

MELINDA HAAG
United States Attorney

Dated: June 25, 2014

BENJAMIN KINGSLEY
Assistant United States Attorney

PLEA AGREEMENT
CR 14-264 VC                                    10

23. I have fully explained to my client all the rights that a criminal defendant has and all the terms of this Agreement. In my opinion, my client understands all the terms of this Agreement and all the rights my client is giving up by pleading guilty, and, based on the information now known to me, my client's decision to plead guilty is knowing and voluntary.

Dated: June 23, 2014

                                                TED W. CASSMAN
                                                Attorney for Defendant

PLEA AGREEMENT
CR 14-264 VC

11