# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| BARRY HONIG, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-00184-CCE-LPA |
| | ) | |
| ROBERT LADD, an individual; MGT | ) | |
| CAPITAL INVESTMENTS, INC., | ) | |
| a Delaware corporation; TERI BUHL, | ) | |
| an individual; and DOES 1-20, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## BRIEF IN OPPOSITION TO DEFENDANT TERRI BUHL'S MOTION TO DISMISS

David E. Fox, Esq.
N.C. State Bar No. 10332
MOORE & VAN ALLEN PLLC
3015 Carrington Mill Blvd., Suite 400
Morrisville, North Carolina 28202-4003
Tel:  (704) 331-1000
Fax: (704) 331-1159
Email: davidfox@mvalaw.com

Charles J. Harder, Esq.*
Ryan J. Stonerock, Esq.*
HARDER MIRELL & ABRAMS LLP
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90212
Tel:  (424) 203-1600
Fax: (424) 203-1601
Email: charder@hmafirm.com
            rstonerock@hmafirm.com
*L.R.83.1(d) Special Appearance

*Counsel for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

SUMMARY OF RELEVANT FACTS ............................................................................. 3

    1.    Defendants conspire to defame Honig. .......................................................... 3

    2.    Ladd/MGT were located in North Carolina during Defendants' conspiracy. ................................................................................................... 6

ARGUMENT..................................................................................................................... 10

    1.    The motion to dismiss for lack of personal jurisdiction should be denied. ......................................................................................................... 10

        A.    Standards on personal jurisdiction. .................................................... 10

        B.    Buhl's conspiracy with Ladd/MGT and conduct directed towards North Carolina subjects her to personal jurisdiction here. ................................................................................................... 12

    2.    The motion to dismiss for improper venue should be denied. .................... 16

    3.    Plaintiff's claims are adequately pled. ....................................................... 18

        A.    Standards on motions to dismiss for failure to state a claim............ 18

        B.    The Court should apply the substantive law of North Carolina or, alternatively, Florida. ................................................................. 18

        C.    Plaintiff has adequately alleged a claim for defamation. ................. 19

            i.    The Statements and Articles are not privileged. ................... 19

            ii.    The defamatory statements are not opinion, hyperbole, or exaggeration.................................................................... 24

            iii.    The remaining Statements are defamatory............................ 29

        D.    Plaintiff has adequately alleged a conspiracy................................... 30

        E.    Plaintiff should be granted leave to amend, if necessary. ................ 31

CONCLUSION ................................................................................................................. 31

CERTIFICATE OF WORD COUNT ............................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Bain*, 697 F.2d 1213 (4th Cir. 1982)...................................................................... 11

*Ausley v. Bishop*, 33 N.C. App. 210, 515 S.E.2d 72 (1999).................................................. 30

*Badame v. Lampke*, 242 N.C. 755, 89 S.E.2d 466 (1955)............................................... 29, 30

*BeoCare Grp., Inc. v. Morrissey*, 124 F. Supp. 3d 696 (W.D.N.C. 2015)........................... 13

*Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir. 1998)............................................ 25

*Broam v. Bogan*, 320 F.3d 1023 (9th Cir. 2003)................................................................... 18

*Capitol Leasing Co. v. FDIC*, 999 F.2d 188 (7th Cir. 1993) ................................................ 11

*CEM Corp. v. Personal Chemistry*, 55 Fed. Appx. 621 (4th Cir. 2003)............................... 12

*Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993) ........................................... 22

*Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*,
    259 F.3d 209 (4th Cir. 2001) ........................................................................................... 12

*Combs v. Bakker*, 886 F.2d 673 (4th Cir. 1989).................................................................... 10

*Craven v. SEIU Cope*, 188 N.C. App. 814, 656 S.E.2d 729 (2008).................................... 27

*Crutchfield v. ImmunoScience, Inc.*, No. 1:08CV561, 2012 WL 263396
    (M.D.N.C. Jan. 30, 2012), *report and recommendation adopted*, No.
    1:08CV561, 2012 WL 1077450 (M.D.N.C. Mar. 30, 2012) ................................. 11, 13

*Daniels v. Metro Magazine Holding Co.*, 179 N.C. App. 533, 634 S.E.2d
    586 (2006) ........................................................................................................................ 25

*Desmond v. News & Observer Publ'g Co.*, 241 N.C. App. 10, 772 S.E.2d
    128, appeal dismissed, review denied, 776 S.E.2d 195 (N.C. 2015)............................. 20

*Eakin v. Rosen*, No. CV215-42, 2015 WL 8757062 (S.D. Ga. Dec. 11,
    2015) ................................................................................................................................ 17

*Eli Glob., LLC v. Heavner*, 794 S.E.2d 820 (N.C. Ct. App. 2016) .................................... 28

*Ellis v. Northern Star Co.*, 326 N.C. 219, 388 S.E.2d 127 (1990) ..................................... 30

*Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ........................................................................................... 18

*Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654 (4th Cir. 1989) ......................... 12

*Ford v. Rowland*, 562 So. 2d 731 (Fla. Dist. Ct. App. 5th Dist. 1990) ............................ 27

*From v. Tallahassee Democrat*, 400 So. 2d 52 (Fla. Dist. Ct. App. 1st Dist. 1981) ............................................................................................... 25

*Hayashi v. Red Wing Peat Corp.*, 396 F.2d 13 (9th Cir. 1968) ........................... 17

*Kinloch v. News & Observer Publ'g Co.*, 427 F.2d 350 (4th Cir. 1970) ........................ 21

*LaComb v. Jacksonville Daily News Co.*, 142 N.C. App. 511, 543 S.E.2d 219 (2001) ............................................................................................ 20, 22

*Lee v. Dong–A Ilbo*, 849 F.2d 876 (4th Cir. 1988) ............................................. 21

*Lewis v. Rapp*, 220 N.C. App. 299, 725 S.E.2d 597 (2012) ............................... 29

*Lolavar v. de Santibanes*, 430 F.3d 221 (4th Cir. 2005) ............................. 12, 13

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) ............................. 18

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991) ........................................................................... 23

*McLaughlin v. McPhail*, 707 F.2d 800 (4th Cir. 1983) ....................................... 12

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990) ............................................................................................... 25

*Moldea v. N.Y. Times Co.*, 15 F.3d 1137, *aff'd as modified*, 22 F.3d 310 (D.C. Cir. 1994) ................................................................................. 26

*Mylan Labs., Inc. v. Akzo, N .V.*, 2 F.3d 56 (4th Cir. 1993) ............................. 12

*Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130 (4th Cir. 1993) ................................. 18

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) ............................................................................................... 23

*Nobles v. Boyd*, No. 7:14-CV-214-FL, 2015 WL 2165962 (E.D.N.C. May 8, 2015) ............................................................................................... 25

*Ostrzenski v. Seigel*, 177 F.3d 245 (4th Cir. 1999) ........................................... 31

*Paulson v. Cosmetic Dermatology, Inc.*, No. 17-20094-CIV, 2017 WL 2484197 (S.D. Fla. Jun. 8, 2017) ................................................................ 30

*Rasmussen v. Collier Cty. Publ'g Co.*, 946 So. 2d 567 (Fla. Dist. Ct. App. 2d Dist. 2006)................................................................................................ 20

*Reuber v. Food Chem. News, Inc.*, 925 F.2d 703 (4th Cir. 1991) ..................................... 22

*Seminole Transp. Specialists, Inc. v. PDM Bridge, LLC*, No. 8:09-CV-1885-T-23MAP, 2009 WL 3822773 (M.D. Fla. Nov. 16, 2009) ............................... 17

*Shoe Show, Inc. v. One-Gateway Assocs.*, LLC, No. 1:14CV434, 2015 WL 1128016 (M.D.N.C. Mar. 12, 2015) ................................................................ 10

*Snyder v. Phelps*, 580 F.3d 206 (4th Cir. 2009) ..................................................... 24

*Thompson v. Paul*, 657 F. Supp. 2d 1113 (D. Ariz. 2009).................................................. 20

*Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553 (4th Cir. 2014) ........................ 12

*Wolf v. Richmond Cty. Hosp. Auth.*, 745 F.2d 904 (4th Cir. 1984).................................... 11

**Constitution and Statutes**

U.S. CONST. amend. XIV ................................................................................. 12

28 U.S.C.A. § 1391(b)(2) ................................................................................. 16

**Rules**

Fed. R. Civ. P. 11................................................................................................ 8

Fed. R. Civ. P. 12(b)(6) .................................................................................. 18

Fed. R. Civ. P. 15(a)(2) ..................................................................................... 31

# INTRODUCTION

Plaintiff Barry Honig ("Plaintiff" or "Honig") is a private investor who is the victim of a conspiracy between defendants Robert Ladd ("Ladd"), MGT Capital Investments, Inc. ("MGT") (collectively "Ladd/MGT"), and Teri Buhl ("Buhl") (together with Ladd/MGT, "Defendants") to publish a series of false and highly defamatory articles about Honig. The articles, conceived of by Ladd/MGT, authored by Buhl, and published on Buhl's website, contain assertions that Honig, among other things, is violating securities laws, is the "target" of a Securities and Exchange Commission ("SEC") investigation arising out of those violations, and that "90%" of a SEC subpoena served on MGT (the "Subpoena") is about Honig. These statements, and many others, are unequivocally false. Defendants conspired to defame Honig in order to divert attention away from MGT as the target of the very SEC scrutiny that the articles falsely allege is directed at Honig, and also to boost the stock price of MGT, which had declined after MGT's disclosure of the Subpoena. Defendants' defamatory statements about Honig have caused Honig considerable reputational and economic harm.

Honig filed this lawsuit to protect his reputation and hold Defendants liable for the damages their conduct has caused. Buhl now moves to dismiss based on the arguments that (1) the Court lacks personal jurisdiction over her, (2) venue is improper and (3) Honig's claims fail as a matter of law. All of these arguments should be rejected.

First, personal jurisdiction over Buhl is proper in this Court because she conspired with North Carolina residents, Ladd/MGT, in publishing the articles. The declarations of Barry Honig and Eric Anderson submitted herewith unequivocally establish that Buhl

communicated and conspired with Ladd/MGT in writing the defamatory articles about Honig while Ladd/MGT were residing in North Carolina.[1]  Buhl did so because of her dislike of Honig, her long-term personal relationship with Ladd, and to drive internet traffic to her website.

Second, venue in this Court is proper because a substantial part of the events giving rise to Honig's claims occurred in this District.  Buhl engaged in the conspiracy with Ladd/MGT while they resided in this District.

Third, all of Honig's claims are properly pled.  As detailed herein, Honig has adequately pled actionable defamatory statements attributed to Buhl, as well as his actionable claims for conspiracy, intentional interference with prospective economic advantage, and unfair and deceptive trade practices, against Buhl.

Buhl's arguments to dismiss Honig's defamation claim should be rejected.  Buhl's defamatory statements are not privileged.  Further, the defamatory statements are not opinion or hyperbole because they are assertions of verifiable fact.  The statements are

---

[1] In their pending motion to dismiss, Ladd/MGT attempted to mislead this Court into believing they did not reside in North Carolina when Buhl published her September 23, 2016 article about Honig (and when Ladd/MGT made their defamatory statements to Buhl).  Ladd/MGT argued in their motion that "publicly available SEC filings indicate that in September 2016, when the Ladd Defamatory Statements were allegedly made, MGT's principal corporate office was in Harrison, New York, which is located within the Southern District of New York."  Dkt. No. 20 at p. 13.  Tellingly, neither Ladd nor any other MGT employee submitted a declaration to support this assertion or deny being present in this District when the defamatory statements were made in September 2016.  That is because, as detailed herein, **Ladd and MGT had moved to this District well in advance of the September 23, 2016 article and conducted the conspiracy with Buhl while located here**.  *See* Declaration of Eric Anderson filed concurrently herewith ("Anderson Decl."), ¶¶ 2-6; Dkt. No. 32, Stonerock Decl., Exhibits A and B.

also defamatory *per se* because they impugn Honig's conduct within his profession as an investor and accuse him of criminal activity.

Honig has sufficiently alleged a claim for defamation against Buhl, and Honig's other claims likewise sufficiently allege tortious conduct by Buhl to impose liability. The Court therefore should deny Buhl's motion to dismiss in its entirety. Alternatively, Honig requests leave to amend.

## SUMMARY OF RELEVANT FACTS

**1. Defendants conspire to defame Honig.**

Buhl claims to be an "investigative journalist." Dkt. No. 1, Complaint at ¶ 1. Ladd is the President and CEO of MGT, a publicly-traded company in which Honig is a shareholder. *Id.* In an effort to divert attention away from MGT as the target of an SEC investigation, Defendants conspired to publish a series of false and highly defamatory articles about Honig. *See Id.* at ¶¶ 1-4.

On September 15, 2016, MGT was served with a non-public subpoena by the SEC ("Subpoena"). *Id.* at ¶ 19. On September 19, 2016, MGT issued a press release disclosing its receipt of the Subpoena. *Id.* at ¶ 20. MGT's stock price then suffered a substantial decline in value. *Id.* at ¶ 21.

Thereafter, Defendants conspired to divert attention away from MGT as the target of the SEC investigation by falsely claiming that the investigation was aimed at Honig. *Id.* at ¶ 3. By trying to place the focus on Honig, Defendants sought to deceive the public into believing MGT was not the focus of the SEC investigation and that it was safe to

purchase MGT's stock.  *Id.*  Defendants engaged in this distortion campaign in an attempt to boost the share price of MGT.  *Id.*

More specifically, after MGT's receipt of the Subpoena, Defendants intentionally conspired to defame Honig in articles, which were published on Buhl's financial "news" website, teribuhl.com (the "Website").  Dkt. No. 1, Complaint at ¶ 22.  On or about September 23, 2016, Buhl published an article on the Website entitled "*Investor Barry Honig Target of SEC MGT Capital Subpoena*" (the "September 23, 2016 article").  *Id.* at ¶ 23 and Exhibit C thereto.  The September 23, 2016 article contains the following false and defamatory statements, among others listed in the Complaint:

- "Investor Barry Honig Target of SEC MGT Capital Subpoena."
- "Microcap investor Barry C. Honig is the target of an SEC investigation for his role in trading and investing in shares of MGT Capital ($MGT)."
- "90% of the regulator's questions are about Honig."
- "Honig has been calling SEC enforcement defense lawyers this week looking for representation."
- "Barry uses other people to run a company he is secretly controlling and pays stock pumpers to tout the company without disclosure."
- Honig "runs things behind the scene."
- Honig allegedly engages in "tons of questionable pump and dump deals."
- Honig's counsel allegedly "has been able to keep the SEC at bay."
- Honig "acted as an affiliate in trading MGT stock."
- "Market participants sit on the side line to see if the SEC can get the goods to finally charge Barry Honig."

*Id.* at ¶ 24.

In truth, the Subpoena mentions Honig's name only once in the twenty categories of documents to be produced by MGT, as part of a list that includes numerous other shareholders of MGT.  *Id.* at ¶ 26.  Honig is **not** the target of the Subpoena or an SEC

investigation, nor is he the subject of 90 percent of the regulator's questions to MGT, as falsely stated by Defendants. *Id.*

Honig's counsel sent Buhl a letter demanding a full retraction and apology. Buhl refused to comply, but did change the title of the September 23, 2016 article to "*Investor Barry Honig Subject of SEC MGT Capital Subpoena*" (replacing "Target" with "Subject"), an equally false statement misleading readers into the belief that Honig is the sole or primary focus of the Subpoena. *Id.* at ¶ 27 and Exhibit D thereto.

In furtherance of Defendants' conspiracy, on or about February 9, 2017, Buhl published another article on the Website entitled "*Here it is: that MGT Capital SEC Subpoena*" (the "February 9, 2017 article"). *Id.* at ¶ 34 and Exhibit F thereto. In connection with Buhl's publication of the February 9, 2017 article, Ladd/MGT sent a copy of the Subpoena to Buhl, which she then posted along with the article. *Id.*

The February 9, 2017 article republished several of the false and defamatory statements in the September 23, 2016 article. In total, Buhl published four articles defaming Honig, collectively referred to herein as the "Articles" (and the defamatory statements therein are referred to herein as the "Statements").[2]

The Articles have injured Honig in his trade and profession and are continuing to cause him substantial harm. *Id.* at ¶ 6.

---

[2] The other two articles, entitled "*Microcap Attorney Jaclin's Co-Conspirator Turned DOJ Witness in Shell Factory Scheme*," and "*California DOJ investigating Honig and The Frost Group*," were published to the Website on May 26, 2016 and November 8, 2016, respectively. Dkt. No. 1, Complaint at ¶¶ 17-18, 32-33.

**2. Ladd/MGT were located in North Carolina during Defendants' conspiracy.**

Defendants have asserted that no conduct occurred in North Carolina, mostly relying upon the assertion that MGT's principal corporate office supposedly was located in Harrison, New York when the Statements were first made (September 23, 2016). However, that assertion is false and ignores other—admitted—conduct occurring in North Carolina.

<u>First</u>, the acting Chief Technology Officer ("CTO") of MGT, Eric Anderson ("Anderson"), has confirmed that MGT opened its principal corporate offices in Durham, North Carolina, located at 512 S. Mangum Street, Durham, North Carolina 27701 ("MGT Offices") between September 1, 2016 and September 3, 2016. Anderson Decl., ¶ 4. In addition, Anderson met with Ladd in North Carolina between August 25, 2016 and August 29, 2016 to prepare for MGT's move into the MGT Offices and attended a walkthrough of the MGT Offices with Ladd during that time. *Id*, ¶ 3. Anderson also made a second trip to North Carolina from September 17, 2016 through September 24, 2016 during which he worked out of the MGT Offices, which were fully operational. *Id.*, ¶5. Ladd and several computer programmers were also present at the MGT offices during Anderson's visit to the MGT Offices, as well as MGT's Director of Corporate Communications, Tiffany Madison. *Id*. This is the precise time period during which the conspiracy and other tortious conduct by and between Defendants occurred. *Id.*, ¶ 6.

During Anderson's second trip to North Carolina (*i.e*., September 17-24, 2016), Ladd told him, in-person at the MGT Offices in North Carolina, that Ladd conspired and coordinated with Buhl to publish an article on the Website falsely stating that Honig is

violating securities laws, is the "target" of a SEC investigation, and that "90%" of the "questions" in the Subpoena are about Honig. Anderson Decl, ¶ 6. Ladd also told Anderson, in-person at the MGT Offices in North Carolina, that Ladd provided details of the Subpoena to Buhl and was the source of the information leaked to Buhl for the article. *Id.* Ladd further stated, in-person at the MGT Offices in North Carolina, that he wanted Buhl to publish the September 23, 2016 article to divert attention away from MGT, and towards Honig, as the target of the Subpoena and corresponding SEC scrutiny. *Id.*

In addition, Ladd and John McAfee, the Executive Chairman of MGT, told Anderson on multiple occasions, in-person at the MGT Offices in North Carolina, among other locations, that, by placing the blame on Mr. Honig for the Subpoena, they wanted to deceive the public into believing there were no problems at MGT, that there was no SEC scrutiny of Ladd, McAfee or MGT, and that it was safe to purchase MGT's stock. Anderson Decl., ¶ 10. Ladd and McAfee also told Anderson on multiple occasions, in-person at the MGT Offices in North Carolina, among other locations, that they wanted to boost the share price of MGT, which had substantially declined after MGT's disclosure of the Subpoena and other negative events. *Id.*

<u>Second</u>, MGT's own documents show Ladd/MGT had a presence in this District before Buhl published the September 23, 2016 article. Ladd/MGT readily acknowledge that the MGT offices in this District were procured in August 2016. MGT's Form 10-Q filed with the SEC for the period ending September 30, 2016 states: "On August 9, 2016, the Company entered into a Sublease Agreement for an office lease in Durham, North Carolina." *See* Dkt. No. 21, Laverne Decl., Ex. F. The same Form 10-Q also states that

MGT's principal executive offices were in Durham, North Carolina. *Id.*

Third, on **July 25, 2016**, MGT's own website stated: "Mr. Ladd currently lives in Chapel Hill, North Carolina." *See* Dkt. No. 32, Stonerock Decl., Exhibit A. This statement is confirmed by public records, which corroborate that Ladd resided in Chapel Hill in June 2016. *Id.*, Exhibit B. Thus, even if MGT had not yet completed the move of its offices to this District by the time the September 23, 2016 article was published—which it had—Ladd had been living here for several months. Ladd is both an individual defendant, and also the person who engaged in the conspiracy on behalf of MGT.[3]

Fourth, Buhl fails to address the fact that, in furtherance of Defendants' conspiracy, she published the February 9, 2017 article "leaking" the Subpoena and republishing several of the false and defamatory statements in the September 23, 2016 article. Ladd/MGT provided the Subpoena to Buhl several months after MGT moved to this District. Declaration of Barry Honig ("Honig Decl."), filed concurrently herewith, ¶ 12; Anderson Declaration, ¶ 11.

Fifth, Honig had communications with Ladd after the publication of the September 23, 2016 article where Ladd admitted to conspiring with Buhl. In particular, on October 11, 2016, Honig met with Ladd at MGT's headquarters in North Carolina. Honig

---

[3] Ladd/MGT's attempt to intentionally mislead the Court into believing that they were not residents of North Carolina as of September 23, 2016 constitutes sanctionable conduct under Rule 11 of the Federal Rules of Civil Procedure and/or the Court's inherent authority. Accordingly, Honig requests herein all appropriate sanctions and also is evaluating whether to bring a separate motion pursuant to Rule 11. Appropriate sanctions against Ladd/MGT would include, without limitation: attorneys' fees, costs, an appropriate fine and reprimand, and an order striking Ladd/MGT's motion to dismiss for improper venue.

Declaration, ¶ 5.  At that meeting, Ladd told Honig that he was the source behind the September 23, 2016 article.  *Id*. at ¶ 6.  Ladd also called Buhl, and Honig could tell that Ladd and Buhl had a familiar relationship and that Ladd obviously was the primary source behind the September 23, 2016 article.  *Id*.

Further, on January 25, 2017, Honig had another conversation with Ladd regarding the September 23, 2016 article.  *Id*. at ¶ 7.  Ladd admitted that Buhl called him after she learned that MGT had been issued an SEC subpoena and asked specific questions about the Subpoena's contents, including whether the Subpoena mentioned Honig.  *Id*. at ¶ 8.  Ladd explained that he knew Buhl did not like Honig and was interested in connecting Honig to the Subpoena.  *Id*. at ¶ 9.[4]  In an effort to divert the negative attention stemming from the Subpoena away from MGT, Ladd admitted that he worked with Buhl by giving her information meant to "deflect" negative attention from MGT and providing her with information that she could use to paint Honig as the subject of the Subpoena and SEC investigation.  *Id*. at ¶ 10.

Ladd acknowledged that Buhl's references to "interviewing MGT executives" and speaking with "insiders who saw the SEC subpoena" within the September 23, 2016

---

[4] Buhl's dislike for Honig also is obvious from her course of conduct.  In addition to the articles on September 23, 2016 and February 9, 2016, Buhl published two more defamatory articles about Honig.  On May 26, 2016, Buhl published an article on teribuhl.com entitled "*Microcap Attorney Jaclin's Co-Conspirator Turned DOJ Witness in Shell Factory Scheme*" falsely asserting that Honig was likely to be arrested by the DOJ or charged in an enforcement action by the SEC.  *See* Dkt. No. 1, Complaint at ¶¶ 17-18 and Exhibit A thereto.  Also, on November 8, 2016, Buhl published an article on teribuhl.com entitled "*California DOJ investigating Honig and The Frost Group*" falsely asserting that Honig was being investigated by the California DOJ.  *See Id*. at ¶¶ 31-33 and Exhibit E thereto.

article were to Buhl's conversation with him. *Id.* at ¶ 11. Ladd also admitted to Honig that he (Ladd) failed to even read the entire subpoena before speaking with Buhl in advance of the September 23, 2016 article. *Id.* at ¶ 12. Ladd also admitted that he and Buhl have a long-term relationship that involves her contacting him for information about his company and him feeding her insider information that she could then turn into articles disparaging Ladd's rivals and competition. *Id.* at ¶ 13. Ladd further admitted that Buhl "helped" him out with disparaging Josh Silverman, manager of hedge fund Iroquois Capital. *Id.*[5]

## ARGUMENT

### 1. The motion to dismiss for lack of personal jurisdiction should be denied.

A. <u>Standards on personal jurisdiction.</u>

"When the court addresses the question [of personal jurisdiction] on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *Shoe Show, Inc. v. One-Gateway Assocs., LLC*, No. 1:14CV434, 2015 WL 1128016, at *3 (M.D.N.C. Mar. 12, 2015) ("The

---

[5] On June 11, 2014, Buhl published an article on teribuhl.com, based upon statements by Ladd/MGT, accusing Iroquois Capital of engaging in similar securities violations as those falsely attributed to Honig in this case. Dkt. No. 1, Complaint at ¶ 38. In that instance, the article was published in an attempt by Defendants to allow Ladd/MGT to gain the upper hand in their dispute with Iroquois Capital and its principal, Josh Silverman. *Id.* at ¶ 38 and Exhibit G thereto (article entitled "*Iroquois Capital's Josh Silverman Threatens Portfolio Stock CEO*").

plaintiff has the burden of making a prima facie showing of personal jurisdiction.").

Further, when determining whether a plaintiff has proved the existence of the court's jurisdiction over the defendant the court must "construe[] all relevant pleading allegations in the light most favorable to the plaintiff, assume[] credibility, and draw[] the most favorable inferences in favor of jurisdiction." *Crutchfield v. ImmunoScience, Inc.*, No. 1:08CV561, 2012 WL 263396, at *4 (M.D.N.C. Jan. 30, 2012), *report and recommendation adopted*, No. 1:08CV561, 2012 WL 1077450 (M.D.N.C. Mar. 30, 2012) (citing *Combs v. Bakker*, 886 F.2d at 676) (holding that "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction").

When a challenge to a court's personal jurisdiction is made, the court may "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact personal jurisdiction exists." *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993) (citations omitted); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Further, contrary facts in a defendant's declaration do not need to be accepted as true, as Buhl claims, provided the plaintiff submits his own declaration disputing the defendant's factual allegations. *Wolf v. Richmond Cty. Hosp. Auth.*, 745 F.2d 904, 908 (4th Cir. 1984) (holding that allegations within a complaint must be taken as true unless controverted by the defendant's affidavit and the affidavit is "not in turn controverted by statements in plaintiffs' affidavits").

The historical two-step process for determining personal jurisdiction – considering whether the North Carolina long-arm statute authorizes the exercise of jurisdiction and

then inquiring as to whether the exercise of personal jurisdiction comports with the requirements of the Due Process clause (*see Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993)) is no longer necessary because the North Carolina long-arm statute has been construed "as extending jurisdiction to the full extent permitted by the Fourteenth Amendment." *Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001); *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014); *CEM Corp. v. Personal Chemistry*, 55 Fed. Appx. 621, 623 (4th Cir. 2003). Instead, the Court need solely determine whether the exercise of personal jurisdiction comports with the Due Process clause of the 14th Amendment. *See Christian Sci. Bd. of Dirs.*, 259 F.3d at 215.

For specific jurisdiction to be found, Due Process requires that the defendant purposely direct her activities at the forum and that those activities gave rise to the instant suit. *Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 660 (4th Cir. 1989).[6]

B. Buhl's conspiracy with Ladd/MGT and conduct directed towards North Carolina subjects her to personal jurisdiction here.

In the Fourth Circuit, "a conspirator not present in the forum State will, nevertheless, be adjudged to have had a personal presence in the forum State by means of adequate minimum contacts of the other conspirators therein." *Lolavar v. de Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005); *McLaughlin v. McPhail,* 707 F.2d 800, 807 (4th Cir. 1983). Succinctly stated, a plaintiff can establish personal jurisdiction over a defendant

---

[6] For the purposes of Buhl's motion, Honig will focus on whether the Court has specific personal jurisdiction over Buhl.

by "mak[ing] a threshold showing that a conspiracy existed and that the defendants participated therein." *Lolavar v. de Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005); *BeoCare Grp., Inc. v. Morrissey*, 124 F. Supp. 3d 696, 702 (W.D.N.C. 2015) ("(1) that a conspiracy existed; (2) that the ... defendant[ ] participated in the conspiracy; and (3) that a coconspirator's activities in furtherance of the conspiracy had sufficient contacts with [North Carolina] to subject that conspirator to jurisdiction in [North Carolina].").

In *Crutchfield v. ImmunoScience, Inc.,* the court found specific jurisdiction over an out-of-state defendant because the defendant had conspired with an in-state resident to deprive the plaintiff of its rights and property. *Crutchfield v. ImmunoScience, Inc.,* 2012 WL 263396, at *6. The plaintiff alleged that the out-of-state defendant and resident had conspired to deprive it of funding and pointed to evidence of the parties engaging in multiple communications and sharing documents, among other things, as a prima facie showing of such conspiracy.

As detailed more fully herein, Honig has adequately alleged that a conspiracy existed between Defendants to defame Honig, interfere with his prospective economic advantages, and engage in unfair and deceptive trade practices through the publication of false statements about Honig.

Specifically, Buhl called Ladd in North Carolina for the September 23, 2016 article, and Ladd (from North Carolina) gave Buhl the defamatory statements about Honig, to deflect the negative attention created by the Subpoena from MGT to Honig. In the middle of the conspiracy (*i.e.* September 17-24, 2016), Ladd told Anderson, who both were located at the MGT Offices in North Carolina, that he (Ladd) conspired and

coordinated with Buhl to publish the September 23, 2016 article. Anderson Decl., ¶ 6.

During that time, Ladd also told Anderson, in-person at the MGT Offices in North

Carolina, that Ladd provided details of the Subpoena to Buhl, was the source of the

information leaked to Buhl for the September 23, 2016 article and that he wanted Buhl to

publish the September 23, 2016 article, to divert attention away from MGT, and toward

Honig, as the target of the Subpoena and corresponding SEC scrutiny. *Id.*

Buhl does not challenge the existence of a conspiracy or her own participation in

such conspiracy. The Complaint alleges that Buhl had conversations with Ladd/MGT

regarding their desire to draw public attention away from MGT and onto Honig. *See* Dkt.

No. 1, Complaint at ¶ 22. The only fact Buhl offers to refute having communications

with North Carolina residents is the evading statement that she did not call a telephone

number with a North Carolina area code as part of her investigation. *See* Dkt. No. 29,

Buhl Declaration at ¶ 24.

As any reputable investigative journalist would know, the story does not always lie

in what a person says but in what is not said. Buhl does not declare that she did not

communicate with Ladd or anyone else at MGT in North Carolina, she only contends that

she did not call a telephone number with a North Carolina area code. It is just as

conceivable, and not refuted by Buhl, that she called Ladd/MGT while they were located

in North Carolina (using a cell phone with a non-North Carolina area code) and also

communicated with them by email, facsimile, skype, instant message, direct message,

and/or another mode of communication. *See* Honig Declaration, ¶ 4 (stating that Honig

has known Ladd for years, has had numerous conversations with him while he was using

his cell phone, and is aware that Ladd's cell phone number has a New York area code).

Buhl's own Articles admit that she had communications with Ladd/MGT by attributing information within the Articles to its members:

- "The company, currently run by CEO Robert Ladd, says…."
- "According to insiders who saw the SEC subpoena…."
- "I know from interviewing MGT's executives…."
- "I have spoken to people who have seen the subpoena again…."

Dkt. No. 1, Complaint at Exhibits C and D.

It cannot be disputed that Buhl communicated with Ladd/MGT during the course of Defendants' conspiracy. Given the overwhelming evidence that Ladd/MGT were located in North Carolina during that time, Buhl undeniably conspired and communicated with Ladd/MGT while Ladd/MGT were located in North Carolina.[7]

Lastly, the Complaint alleges, and Buhl does not dispute, that Ladd/MGT provided her a copy of the Subpoena and she published the February 9, 2017 article. The Complaint alleges that article republished many of the defamatory statements from the September 23, 2016 article in furtherance of Defendants' conspiracy. All this occurred at a time when Ladd/MGT concede they were located in North Carolina. *See also* Honig Decl., ¶ 12; Anderson Decl., ¶ 11.

Overall, the evidence submitted by Honig establishes adequate minimum contacts between Buhl and the in-state defendants (Ladd/MGT) in furtherance of Defendants' conspiracy. Ladd/MGT were North Carolina residents when Defendants' conspiratorial

---

[7] Because the Court must draw all inferences in Honig's favor, the Court should not indulge in Buhl's transparent wordsmithing (*e.g.* stating only that she did not call a North Carolina phone number) to avoid this fact.

activities took place. They communicated information to Buhl from North Carolina, and sent documents to Buhl from North Carolina. Buhl received all of those communications and documents from North Carolina and used them to publish the defamatory Articles. The elements required for personal jurisdiction by conspiracy have been satisfied, and this Court may and should exert jurisdiction over Buhl.

**2. The motion to dismiss for improper venue should be denied.**

Buhl argues that venue is improper in this Court, repeating the same arguments (and authorities) asserted by Ladd/MGT in their pending motion to dismiss. As set forth in great detail in Honig's opposition to Ladd/MGT's motion to dismiss (Dkt. 31 at pp. 5-12), venue is proper in this Court because "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C.A. § 1391(b)(2). Honig respectfully adopts his opposition to Ladd/MGT's motion in response to Buhl's same and/or substantially similar arguments.

In addition, Honig has submitted herewith a declaration from Anderson, MGT's then-acting Chief Technology Officer, which confirms that Ladd/MGT were located in North Carolina during, and well in advance of, Defendants' conspiracy, which began when the Subpoena was issued on September 15, 2016 and continued through Buhl's publication of the first article on September 23, 2016 until her publication of the Subpoena in the February 9, 2017 article.

In sum, Anderson confirms that MGT opened the MGT Offices in North Carolina between September 1, 2016 and September 3, 2016. Anderson Decl., ¶ 4. Anderson met with Ladd in North Carolina between August 25, 2016 and August 29, 2016 and attended

a walkthrough of the MGT Offices in North Carolina with Ladd during that time. *Id*, ¶ 3.

Anderson also came to North Carolina from September 17, 2016 through September 24,

2016 during which he worked out of the MGT Offices, which were fully operational. *Id.*,

¶5. Anderson confirms that, while he was working in the MGT Offices in North

Carolina, that Ladd, several computer programmers that had recently been hired by

MGT, and MGT's Director of Corporate Communications, Tiffany Madison, were all

present at the MGT Offices in North Carolina. *Id.*

Venue is proper in this District because Defendants conducted their conspiracy

from this District and received the benefits of that conspiracy in this District. As shown

herein, Ladd/MGT were in this District when they conspired with Buhl. Moreover,

Buhl's involvement is based upon her direct communications with North Carolina

residents, Ladd/MGT. The Articles at issue were also published and available in this

District. *See Eakin v. Rosen*, No. CV215-42, 2015 WL 8757062 (S.D. Ga. Dec. 11,

2015); Dkt. No. 33, Fox Declaration, Exhibits A through D (showing the Articles are

accessible and therefore were communicated to people in this District).

Lastly, if the Court for whatever reason is not persuaded that Honig has presented

sufficient evidence to deny the motion to dismiss, Honig respectfully requests the Court

grant him leave to conduct jurisdictional and/or venue discovery. *Hayashi v. Red Wing

Peat Corp.*, 396 F.2d 13, 14 (9th Cir. 1968). Alternatively, if the Court is inclined to

grant the motion, it should transfer this case to Florida, where Honig resides. *See

Seminole Transp. Specialists, Inc. v. PDM Bridge, LLC*, No. 8:09-CV-1885-T-23MAP,

2009 WL 3822773, at *2–*3 (M.D. Fla. Nov. 16, 2009) (holding that in the context of

defamation and other non-physical torts, courts generally hold that venue under section 1391(a)(2) is proper in the district where the injured party resides and the defamatory statements were published).

### 3. Plaintiff's claims are adequately pled.

A. <u>Standards on motions to dismiss for failure to state a claim.</u>

Courts have viewed with "disfavor" motions to dismiss under Rule 12(b)(6) because of the lesser role pleadings play in federal practice and the liberal policy of amendment. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (stating Rule 12(b)(6) motions "viewed with disfavor and rarely granted"); *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (stating Rule 12(b)(6) dismissal with prejudice proper only in "extraordinary" cases).

When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam) (citations omitted). A complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Id.* at 93 (alteration and internal quotation marks omitted). Further, the court "should view the complaint in the light most favorable to the Plaintiff." *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

B. <u>The Court should apply the substantive law of North Carolina or, alternatively, Florida.</u>

Buhl argues that substantive New York law should apply in this case, repeating the same arguments (and authorities) made by Ladd/MGT in their motion to dismiss. As set

forth in great detail in Honig's opposition to Ladd/MGT's motion to dismiss (Dkt. 31), New York law is a distant third in the conflict of law analysis, wherein North Carolina and Florida law are far superior. Honig respectfully adopts his opposition to Ladd/MGT's motion in response to Buhl's identical argument.

Overall, the Court should apply the substantive law of North Carolina to this motion because the most relevant conduct giving rise to this lawsuit is the conspiracy to publish the Statements, activity which occurred while Ladd/MGT resided in North Carolina. Alternatively, the Court should apply the substantive law of Florida, the state of Honig's residence.

C. <u>Plaintiff has adequately alleged a claim for defamation.</u>[8]

### i. The Statements and Articles are not privileged.

Buhl's argues that some of the Statements about the government investigations into Honig and about Honig's alleged trading practices are not actionable because they are substantially true reports about judicial and regulatory proceedings, attempting to shield herself by a fair report privilege.[9] However, the privilege does not apply because:

---

[8] Like Ladd/MGT, Buhl incorrectly asserts that the New York District Court "expressed doubts as to the viability of Honig's defamation claims." Dkt. No. 28 at p. 3. While that court did ask questions about whether a few of the alleged defamatory statements could survive a motion to dismiss, the court did not express doubts of the viability of Honig's claims – just the opposite. That court made it clear that it believed Honig's case would survive a motion to dismiss. *See, e.g.*, Dkt. No. 21, Laverne Decl., Ex. B (transcript of Feb. 1, 2017 proceedings in *Honig v. Buhl* (S.D.N.Y.)) at 14:10-12 ("THE COURT: Let me say that today's conference just confirms my view that this case is replete with legal and factual issues that **will occupy all of us for several years**.") (Emphasis added.)

[9] Buhl does not argue that all of the Statements are privileged. *See* Dkt. No. 28 at p. 19 (referring to on Complaint ¶¶ 24(a)-(c), (e)-(g), 27, 32(a)-(b)). Accordingly, even if the Court finds that certain of the Statements are privileged, it cannot grant Buhl's 12(b)(6)

(1) the Statements are not about judicial or regulatory proceedings (2), the Statements are not substantially true, and (3) Buhl plainly adopted the defamatory statements about Honig as her own and published the Articles with the intent to harm Honig, knowing that the defamatory statements were not true.

First, North Carolina courts have applied a very narrow privilege for the press to report on judicial and government proceedings, provided that the reporting offers a substantially accurate account. *Desmond v. News & Observer Publ'g Co.*, 241 N.C. App. 10, 25, 772 S.E.2d 128, 140, appeal dismissed, review denied, 776 S.E.2d 195 (N.C. 2015) (citing *LaComb v. Jacksonville Daily News Co.*, 142 N.C. App. 511, 512–13, 543 S.E.2d 219, 220–21, disc. review denied, 353 N.C. 727, 550 S.E.2d 778 (2001)).[10]

*Desmond v. News & Observer Publ'g Co.* involved allegedly defamatory statements made in the press coverage of a criminal trial, and *LaComb v. Jacksonville Daily News Co.* similarly involved defamatory statements made in the press coverage of criminal arrests. Therein, *LaComb* recognized that while "the fair report privilege has never been explicitly defined by North Carolina case law," it is limited to "[o]fficial statements made in a judicial proceeding," including arrest warrants. *LaComb v.*

_____

motion to dismiss on the basis of privilege because it would not dispose of an entire claim. *See Thompson v. Paul*, 657 F. Supp. 2d 1113, 1129 (D. Ariz. 2009) ("The Court is unaware, however, of any situation in which a Rule 12(b)(6) motion may be used to strike certain allegations in support of a claim, where the underlying claim itself is not challenged.").
[10] Florida law provides a similar privilege. *See Rasmussen v. Collier Cty. Publ'g Co.*, 946 So. 2d 567, 570–71 (Fla. Dist. Ct. App. 2d Dist. 2006) (citation omitted) (holding that news organization "has a qualified privilege to report accurately on information received from government officials. The privilege extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair.").

*Jacksonville Daily News Co.*, 142 N.C. App. at 513 ("The fair report privilege flows from the absolute privilege which attaches to statements made 'in the due course of a judicial proceeding.'" (citing *Jarman v. Offutt*, 239 N.C. 468, 472, 80 S.E.2d 248, 251 (1954)).

Buhl has not shown how the conditional privilege applies where no formal proceedings have taken place. Rather, the SEC merely issued a subpoena for information. It was Defendants who tried to characterize the Subpoena as a more formal indictment of Honig's conduct. Therefore, Buhl has not adequately shown how any fair report privilege applies. Contrast *Kinloch v. News & Observer Publ'g Co.*, 427 F.2d 350, 351 (4th Cir. 1970) (holding privilege applied where, after charges were brought against nightclub, news reporter republished statements from examiner's report after North Carolina State Board of Alcoholic Control conducted two hearings).

That conclusion is fortified by looking at the underlying rational for the privilege. Under Buhl's theory, any member of the press would be entitled to rely upon the fair report privilege any time the government or judiciary is involved. However, the privilege was never intended to be applied so broadly; rather the fair report privilege is intended to apply when the press **republishes** a defamatory statement **made by or to the government**. *See, e.g., Lee v. Dong–A Ilbo*, 849 F.2d 876, 878 (4th Cir. 1988) ("The official or fair report privilege is an exception to the rule of republication liability. It is a privilege to publish accounts of public proceedings or reports despite their defamatory nature.").

Here, the September 23, 2016 article did not republish the contents of the Subpoena. In fact, she did quite the contrary. In the September 23, 2016 article, Buhl

and Ladd/MGT's invented, false assertions of the nature of the Subpoena, but did not actually publish its contents. The fair report privilege simply does not cover Defendants' conduct.

Second, the fair report privilege only applies to statements that are substantially true. "The law does not require absolute accuracy in reporting. It does impose the word 'substantial' on the accuracy, fairness and completeness. It is sufficient if it conveys to the persons who read it a substantially correct account of the proceedings." *LaComb v. Jacksonville Daily News Co.*, 142 N.C. App. at 513 ("The fair report privilege flows from the absolute privilege which attaches to statements made 'in the due course of a judicial proceeding.'") (citing *Kinloch v. News & Observer Publ'g Co.*, 314 F. Supp. 602, 606 (E.D.N.C. 1969), *aff'd*, 427 F.2d 350 (4th Cir. 1970)).

Here, the Statements are blatantly false and highly defamatory. Again, in truth, the Subpoena mentions Honig's name only once in the twenty categories of documents to be produced by MGT, as part of a list that includes numerous other shareholders of MGT. Surely, the assertion that Honig is the target or subject of the Subpoena or an SEC investigation cannot be seen as substantially true when the Subpoena really has nothing to do with him personally.

Third, "the fair report privilege is not absolute, and can be lost where, with actual malice, the press plainly adopts the defamatory statement as its own." *Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087, 1098 (4th Cir. 1993); *see also Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 714 (4th Cir. 1991) (holding that privilege overcome with showing of defendant's reckless disregard for the truth).

Here, the privilege does not apply because Buhl intentionally harmed Honig by publishing the Articles, which she knew to be false. As shown herein, Buhl conspired with Ladd/MGT with the specific intent to harm Honig. Along with Ladd/MGT, she invented the Statements and Articles and proceeded to publish them knowing they were false. Such conduct evidences actual malice. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) (holding that "actual malice" standard only requires "knowledge" of a statement's falsity or a "reckless disregard" for the truth and in no way requires that the speaker have a specific intent to harm the reputation of an individual with his speech); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will").

Further, Buhl adopted the Statements as her own. While Buhl references Ladd/MGT as the source of her information, she readily adopts their position (not a coincidence considering she was conspiring with Ladd/MGT to defame Honig) and portrays them as facts. Further, Buhl did not send any written request for comment to Plaintiff prior to publication of the September 23, 2016 article, but rather sent a very cryptic statement to his representative that provided no information at all about what Buhl intended to report, or what specifically she was asking Plaintiff to comment on. Dkt. No. 1, Complaint ¶ 29. Then, when presented with contrary facts from Honig's counsel after publication, Buhl doubled down and continued to assert that the Statements were true. Never did Buhl alert her readers to the bias of Ladd/MGT, nor present Honig's

side--because she could not, she knew the Statements were false, but published them anyway to aid Ladd/MGT in their scheme to damage Honig and help themselves.

Overall, Honig's Complaint presents enough factual allegations showing, at the very least, Buhl acted with a reckless disregard for the truth, and therefore any privilege is overcome.

### ii. The defamatory statements are not opinion, hyperbole or exaggeration.

Buhl argues (as do Ladd/MGT in their pending motion to dismiss) that she cannot be liable for defamation because certain of the alleged statements are opinion, hyperbole or exaggeration.[11] Buhl is incorrect.

As an initial matter, Buhl's arguments are conflicting. She first argues that the Articles are factual reports of government activity. But then she claims the Articles contain nothing more than opinion and hyperbole. Buhl cannot have it both ways.[12]

A statement of opinion is one that expresses a subjective view, divorced from implicit assertion of objective fact. *See Snyder v. Phelps*, 580 F.3d 206, 218 (4th Cir. 2009) ("[T]he First Amendment will fully protect statements that cannot reasonably be interpreted as stating actual facts about an individual.") (internal alterations and citations omitted). To determine whether a statement is one of fact or opinion, courts consider

---

[11] Buhl again does not argue that all of the Statements are opinion, hyperbole or exaggeration – only a "majority" of them. Dkt. No. 28 at p. 23. Accordingly, even if the Court finds that certain of the Statements are opinion, hyperbole or exaggeration, it cannot grant Buhl's 12(b)(6) motion to dismiss on that basis because it would not dispose of an entire claim.

[12] While Buhl's arguments inherently conflict, Honig's do not. The Statements are assertions of fact that are not about a government issue, but rather are about Honig.

whether the language used is "loose, figurative, or hyperbolic," as well as the "general tenor of the article." *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998); *From v. Tallahassee Democrat*, 400 So. 2d 52, 57 (Fla. Dist. Ct. App. 1st Dist. 1981).[13]

Buhl first argues that the statement "the regulator is looking for evidence that these people [including Honig] traded as a group and therefore became beneficial owners of the stock" is opinion because it is prefaced with the phrase "[i]t's my belief." However, merely stating "I believe" does not mean the statement is opinion. *Daniels v. Metro Magazine Holding Co.*, 179 N.C. App. 533, 539, 634 S.E.2d 586, 590 (2006) ("someone cannot preface an otherwise defamatory statement with 'in my opinion' and claim immunity from liability"). Whether the regulator is looking for incriminating evidence against Honig is an assertion of verifiable fact, and it furthers the defamatory theme of the Articles to accuse Honig of criminal activity.

Buhl then argues that the statements linking Honig to "players in the microcap space will be arrested by the DOJ or charged with an enforcement action by the SEC," referring to "if the SEC can get the goods to finally charge Barry Honig," and that Honig "acted as an affiliate in trading MGT stock" are not statements of fact because they are speculation on what may happen in the future. However, the suggestion of future criminal charges against Honig is based on undisclosed factual assertions that Honig engaged in criminal activity. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S.

---

[13] Regardless of which state's law applies, the Court's "analysis must also include considerations of federal law because the requirement that an alleged defamatory statement be of fact, rather than opinion, flows from the First Amendment." *Nobles v. Boyd*, No. 7:14-CV-214-FL, 2015 WL 2165962, at *9 (E.D.N.C. May 8, 2015).

Ct. 2695, 2706, 111 L. Ed. 2d 1 (1990) ("Even if the speaker states the facts upon which

he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment

of them is erroneous, the statement may still imply a false assertion of fact."); *see also*

*Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144, *aff'd as modified*, 22 F.3d 310 (D.C. Cir.

1994) ("Just as a speaker is not immunized from liability simply by prefacing otherwise

defamatory statements with the words 'In my opinion ...,' defamatory assessments based

on incorrect 'facts' stated by the speaker are also actionable.").

Buhl, like Ladd/MGT, further contends that the defamatory statements claiming

Honig was the "target" or "subject" of the Subpoena and that 90% of the SEC's questions

were about Honig lack "fixed meanings," therefore constituting opinion. As an initial

matter, whether 90% of the SEC's questions were about Honig is a verifiable fact. It is

not opinion--it is math.

Further, the argument is severely undercut by documents provided in Ladd/MGT's

motion. There, Ladd/MGT cited the SEC Enforcement Manual for the proposition that

the "SEC does not publicly identify the targets of its investigations, as is required by the

Department of Justice under certain circumstances." Dkt. No. 20, Motion at p. 19. If the

term "target" is not a precise term and does not have a fixed meaning, how could the

Department of Justice be required to identify a "target" under certain circumstances, and

why does the SEC make it a point to publish its policy of not identifying "targets"?[14]

---

[14] And, as the New York District Court explained, the term "target" is a term of art when
at least used by the Department of Justice. *See* Dkt. No. 21, Laverne Decl., Ex. B
(transcript of Feb. 1, 2017 proceedings in *Honig v. Buhl* (S.D.N.Y.)) at 10:19-12:4 ("It is
definitely a term of art at the Justice Department, and what it means, generally speaking,

Whether the Subpoena was targeted at Honig, and whether Honig was the target of an SEC investigation into his trading and investing in MGT stock, are verifiable facts, not opinion.

The reality is that the Statements are blatantly false. Honig is not and was not the target of the Subpoena or an SEC investigation, and the Subpoena mentions Honig's name only once within the twenty categories of documents to be produced by MGT (and even then only as part of a list that included numerous shareholders of MGT). Accordingly, the Statements are able to be proven false and therefore constitute statements of fact, not opinion.

Additionally, under no circumstances do the Statements qualify as hyperbole. A statement is protected as "rhetorical hyperbole" only if it is so exaggerated or outlandish that "no reasonable reader would believe [it] to be literally true." *Craven v. SEIU Cope*, 188 N.C. App. 814, 818, 656 S.E.2d 729, 733 (2008); *see also Ford v. Rowland*, 562 So. 2d 731, 735 (Fla. Dist. Ct. App. 5th Dist. 1990) (calling plaintiff a "hooker" sufficiently factual, and not opinion or hyperbole, to withstand a motion to dismiss).

The statement that "90%" of the SEC's "questions" were about Honig is not hyperbole. By giving such a precise number, and within the tenor of the Articles and Statements portraying Honig as the "target" of the Subpoena, any reasonable reader would believe the statement to be portraying true facts.

---

is that the prosecutor has sufficient information at that time to charge the person. That's what target means.").

In an analogous case, the court held that calling a competitor a "predator" was not an opinion or hyperbole. *Eli Glob., LLC v. Heavner*, 794 S.E.2d 820 (N.C. Ct. App. 2016). In dealing with statements regarding the plaintiff's planned hostile takeover of the defendant, the court held that "Defendant's press release was plainly intended to assuage stakeholders' anxiety after the UD Entities filed for Chapter 11 bankruptcies. Considering defendant's statements in this context, their defamatory tenor is even more evident." *Id.* at 827.

The Statements were intended by Defendants' to assuage MGT's stockholders and potential stockholders after MGT received the Subpoena and its stock price declined, that the SEC's focus was on Honig and not MGT—a provably false fact. Under these circumstances, the defamatory tenor is even more evident. The statements are simply not opinion or hyperbole.

The Articles are not written as fanciful opinion pieces. Rather, they purport to be factual insider information regarding Honig uncovered by an "investigative journalist." Accordingly, the Statements do not qualify as opinion, hyperbole or exaggeration.

Lastly, like Ladd/MGT, Buhl argues that the context shows that the statements are opinion, relying mainly on the fact that the Articles were published online. Again, Buhl avoids the obvious truth.

Buhl falsely argues in her motion that the Website is a mere "blog" full of "colloquial and hyperbolic phrases." On the contrary, Buhl touts her website as a financial "news" website. Moreover, numerous individuals and companies, including news organizations in the financial industry, read the Website and subscribe to Buhl's

Twitter feed for financial news, and republish her stories to their own readers.  Dkt. No. 1 at ¶ 55.

Overall, at the very least, a question of fact exists of how a reasonable reader would view the Articles, the Statements, and the Website.  *See generally Lewis v. Rapp*, 220 N.C. App. 299, 300, 725 S.E.2d 597, 599 (2012) (holding that statements criticizing judge's active support of candidate were false statements of fact even though statements were made in blog entry on Facebook).[15]

### iii.  The remaining Statements are defamatory.

Buhl contends that certain Statements are not defamatory, namely Honig "has been calling SEC enforcement defense lawyers . . . looking for representation," that Honig has been "pulling out the big legal guns," and that Honig's counsel "has been able to keep the SEC at bay."  All of these statements effectively claim that Honig has engaged in criminal activity in his profession, which is the theme of the Articles.  As such, they are not only defamatory, they are defamatory *per se*.

"It is well settled that false words imputing to a merchant or business man conduct derogatory to his character and standing as a business man and tending to prejudice him in his business are actionable, and words so uttered may be actionable *per se*."  *Badame v. Lampke*, 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955).  The North

---

[15] Again, Buhl cannot reconcile her "fair report" argument with her argument that her Articles include "casual, emotive, and imprecise speech."  Dkt. No. 28 at p. 27.  She claims her Articles are a fair and accurate report of factual government proceedings, while at the same time claiming they are non-factual, fanciful speech.  She cannot have it both ways.  Rather, even a cursory review of the Statements will confirm they are factual statements about Honig—not governmental proceedings.

Carolina Supreme Court has held:

> [I]n order to be actionable without proof of special damage, the false words (1) must touch the plaintiff in his special trade or occupation, and (2) must contain an imputation necessarily hurtful in its effect on his business…To be actionable per se, they must be uttered of him in his business relation. Defamation of this class ordinarily includes charges made by one trader or merchant tending to degrade a rival by charging him with dishonorable conduct in business.

*Id.* (citations omitted); *see also Ellis v. Northern Star Co.*, 326 N.C. 219, 224, 388 S.E.2d 127, 130 (1990) (letter accusing plaintiff of committing "an unauthorized act" was libelous *per se* because it "impeache[d the plaintiff] in its trade as a food broker"); *Ausley v. Bishop*, 133 N.C. App. 210, 215, 515 S.E.2d 72, 76 (1999) (plaintiff's allegations that defendant, a former employee who "was launching his own business as an appraiser" and had engaged in theft and loan fraud "undoubtedly had the capacity to harm defendant in his trade or profession"); *Paulson v. Cosmetic Dermatology, Inc.*, No. 17-20094-CIV, 2017 WL 2484197, at *3 (S.D. Fla. Jun. 8, 2017).

Honig is an investor by profession. *See* Dkt. No. 1, Complaint at ¶¶ 1, 7. Obviously, claiming that Honig has to employ "big legal guns" to thwart the SEC impugns his conduct within his profession by falsely claiming the SEC is investigating him for wrongdoing with respect to his trading and investing activities. Further, the Statements accuse Honig of **criminal activity**. Such accusations are defamatory *per se*.

    D. <u>Plaintiff has adequately alleged a conspiracy.</u>

Buhl makes nearly identical arguments as Ladd/MGT in asserting that Honig's remaining claims should be dismissed. Namely, Buhl argues that the additional claims are duplicative of the defamation claim. As set forth in great detail in Honig's opposition

to Ladd/MGT's motion to dismiss (Dkt. No. 31 at pp. 28-32), Honig's additional claims are sufficiently alleged to withstand a motion to dismiss.  Honig respectfully adopts his opposition to Ladd/MGT's motion in response to Buhl's identical argument.

    E.  <u>Plaintiff should be granted leave to amend, if necessary.</u>

"The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see also Ostrzenski v. Seigel*, 177 F.3d 245, 252 (4th Cir. 1999) ("the district court should not have dismissed the complaint with prejudice without permitting [plaintiff] an opportunity to amend").

If the Court for whatever reason concludes that Honig must allege his claims with more specificity, he can do so and therefore requests that the Court grant him leave to amend.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, the Court should deny the motion to dismiss in its entirety.  Alternatively, Honig requests leave to conduct jurisdictional/venue discovery and/or leave to amend.

Dated: July 26, 2017    Respectfully submitted,

**MOORE & VAN ALLEN PLLC**

By: /s/ David E. Fox
David E. Fox, Esq.
N.C. State Bar No. 10332
Moore & Van Allen PLLC
3015 Carrington Mill Blvd., Suite 400
Morrisville, North Carolina 28202-4003
Tel: (704) 331-1000
Fax: (704) 331-1159
Email: davidfox@mvalaw.com


Charles J. Harder, Esq.*
Ryan J. Stonerock, Esq.*
**HARDER MIRELL & ABRAMS LLP**
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90212
Tel: (424) 203-1600
Fax: (424) 203-1601
Email: charder@hmafirm.com
Email: rstonerock@hmafirm.com
* LR 83.1(d) Special Appearance

*Counsel for Plaintiff*

## CERTIFICATE OF WORD COUNT

This brief does not exceed the word limit of 9,000 words and complies with LR

7.3(d)(1).

Dated: July 26, 2017         Respectfully submitted,

**MOORE & VAN ALLEN PLLC**

By: /s/ David E. Fox
David E. Fox, Esq.
N.C. State Bar No. 10332
Moore & Van Allen PLLC
3015 Carrington Mill Blvd., Suite 400
Morrisville, North Carolina 28202-4003
Tel: (704) 331-1000
Fax: (704) 331-1159
Email: davidfox@mvalaw.com

Charles J. Harder, Esq.*
Ryan J. Stonerock, Esq.*
**HARDER MIRELL & ABRAMS LLP**
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90212
Tel: (424) 203-1600
Fax: (424) 203-1601
Email: charder@hmafirm.com
Email: rstonerock@hmafirm.com
* LR 83.1(d) Special Appearance

*Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing **BRIEF IN OPPOSITION TO DEFENDANT TERRI BUHL'S MOTION TO DISMISS** was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to the following counsel of record:

Jonathan C. Krisko
Erik R. Zimmerman
*Robinson, Bradshaw & Hinson P.A.*
101 N. Tryon Street, Suite 1900
Charlotte, NC 28246
*jkrisko@robinsonbradshaw.com*
*ezimmerman@robinsonbradshaw.com*

Darren Laverne
Jeffrey W. Davis
John P. Coffey
Kramer, Levin, Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
*dlaverne@kramerlevin.com*
*jdavis@kramerlevin.com*
*scoffey@kramerlevin.com*

*Attorneys for Defendants, Robert Ladd
and MGT Capital Investments, Inc.*

Kimberly M. Marston
Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P.
2000 Renaissance Plaza
230 North Elm Street
Greensboro, NC 27401
*kmarston@brookspierce.com*

Eric M. David
Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street

Raleigh, NC 27601
*edavid@brookspierce.com*

Michael Tremonte
Erica A. Wolff
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
*mtremonte@shertremonte.com*
*ewolff@shertremonte.com*

*Attorneys for Defendant, Teri Buhl*

This 26th day of July, 2017.

/s/ David E. Fox
David E. Fox